UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

BANKUNITED FINANCIAL
CORPORATION, *et al.*,[1]

    Debtors.

_____/

BANKUNITED FINANCIAL
CORPORATION, BANKUNITED
FINANCIAL SERVICES, INC., CRE
AMERICA CORPORATION, and BU
REALTY CORPORATION,

    Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as Receiver
of BankUnited, FSB,

    Defendant.

_____/

Case No. 09-19940-LMI

Chapter 11

Jointly Administered

Adv. No. 10-02872-LMI

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF
THE COMPLAINT AND FOR SUMMARY JUDGMENT ON COUNT II OF THE
COMPLAINT**

Plaintiffs BankUnited Financial Corporation ("**BUFC**"), BankUnited Financial Services,

Incorporated ("**BUFS**"), CRE America Corporation ("**CRE**") (collectively the "**Debtors**"), and

BU Realty Corporation ("**BU Realty**," and together with the Debtors, the "**Plaintiffs**") move

under Fed. R. Civ. P. 56, made applicable here by Fed. R. Bankr. P. 7056, against defendant

Federal Deposit Insurance Corporation (the "**FDIC**"), in its capacity as receiver ("**FDIC-R**") for

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): BankUnited Financial Corporation, a Florida corporation (7773); CRE America Corporation, a Florida corporation (0049); and BankUnited Financial Services, Incorporated, a Florida corporation (8335). The address of each of the Debtors is c/o Development Specialists, Inc., 200 South Biscayne Blvd., Suite 1818, Miami, FL 33131.

BankUnited, FSB ("**BUFSB**") for partial summary judgment disallowing the claims asserting a direct entitlement to the Tax Refunds in Count I of their *Amended Complaint* [D.E. 67] (the "**Complaint**"), and for summary judgment on the entirety of Count II of the Complaint.   In support of this Motion, Plaintiffs respectfully state as follows:

<u>**Preliminary Statement**</u>

By way of this Motion, Plaintiffs seek the entry of partial and final summary judgment with respect to Counts I and II of the Complaint, respectively, directed in each instance to the entitlement to subject Tax Refunds (as defined and explained below) in an aggregate amount likely in the range of $49.5 million.  The issue framed by those Counts and the instant Motion distills down to a straightforward question of contract law and interpretation:

> BUFC and BUFSB, as members of an affiliated tax group, are parties to a tax sharing agreement that allocates income tax assets and liabilities among the group's members.   The tax sharing agreement establishes a debtor-creditor relationship between the parties, which relationship determines the rights of the parties to share in any tax refunds received.   Does the tax sharing agreement govern the parties' rights to any forthcoming tax refunds, or can the Court disregard this contract and impose a trust or agency relationship that was not specified in, nor bargained for by the parties to, the tax sharing agreement?

This single question subsumes the numerous issues that arise from the FDIC-R's claim that BUFC holds certain pre-petition tax refunds in trust for BUFSB.  Because the tax sharing agreement between BUFC and BUFSB creates a debtor-creditor relationship between BUFC and BUFSB, the FDIC-R's interest in the pre-petition tax refunds is merely that of a general unsecured creditor holding a claim arising out of a pre-petition contract with Debtor BUFC.

## Statement of Uncontested Facts

A.    Commencement of these Bankruptcy Cases and the Receivership

On May 22, 2009 (the "**Petition Date**"), the Debtors commenced these bankruptcy cases by the filing of voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  [Bankr. D.E. 1.]

BUFC is a former unitary savings and loan holding company, incorporated in the State of Florida and formerly headquartered in Coral Gables, Florida.  (*Defendant's Answer to Plaintiff's Amended Complaint* [D.E. 73 (the "**Answer**") ¶ 3.)

BUFC wholly owns the other Plaintiffs.  (Answer ¶ 4.)

BUFC also wholly owns BankUnited, FSB ("**BUFSB**"), a federally chartered savings and loan association with its principal place of business in Coral Gables, Florida.  (Answer ¶ 2.)

Before the Petition Date, on May 21, 2009 (the "**Receivership Date**"), the United States Office of Thrift Supervision closed BUFSB and appointed the FDIC as receiver for BUFSB. (Answer ¶ 11.)

Immediately after the closure of BUFSB, the FDIC-R, acting both as receiver and in its corporate capacity, entered into a Purchase and Assumption Agreement with BankUnited, a *de novo* federal savings association organized under the laws of the United States, for the purchase of substantially all of BUFSB's assets.  (Answer ¶ 12.)

Under the Purchase and Assumption Agreement, FDIC-R retained any rights that BUFSB may have had in any tax refunds.

B.    Tax Sharing Agreement

Before the Receivership Date and the Petition Date, on December 31, 1997, BUFC and BUFSB entered into an *Income Tax Allocation Agreement* (the "**Tax Sharing Agreement**").

(Attachment to BUFC Proof of Claim No. 103-2 ¶ 7(b); a copy of the Tax Sharing Agreement is annexed as Exhibit "1" to the BUFC Proof of Claim No. 103-2.)

BUFC and BUFSB agreed in the Tax Sharing Agreement to a certain allocation of their current and deferred income tax assets and liabilities as between BUFC, BUFSB and other members of BUFC's and BUFSB's "affiliated group," as such term is defined in Section 1504 of the Internal Revenue Code. (Tax Sharing Agreement ¶ A.)

Pursuant to the Tax Sharing Agreement, BUFSB was to make all income tax payments on behalf of the BUFC affiliated group, but each member of the group determined its own income tax liability on an annual and separate-entity basis. (Tax Sharing Agreement ¶¶ 1-2.)

Following this separate-entity calculation, each member recorded a net tax receivable or payable with respect to BUFSB. (Tax Sharing Agreement ¶ 3.)

Within thirty days after BUFSB paid taxes on behalf of the affiliated group, any member with a net tax payable was obligated to pay an amount equal to this payable to BUFSB, and BUFSB was obligated to reimburse any member with a net tax receivable. (Tax Sharing Agreement ¶ 4.)

Any income tax refund received was to be allocated among and paid to the members of the group in accordance with the separate entity calculation and net tax receivable or payable computations discussed above. (Tax Sharing Agreement ¶ 4.)

The Tax Sharing Agreement is governed by the laws of the State of Delaware. (Tax Sharing Agreement ¶ 8.)

C.     FDIC-R's Proof of Claim

The FDIC-R filed a separate proof of claim in each of BUFC, BUFS, and CRE's bankruptcy cases, as claims No. 103, 6, and 1, respectively, each of which appear identical in all

material respects (collectively, the "**Original FDIC-R Proofs of Claim**") on November 16, 2009.  (BUFC Claim No. 103-1; BUFS Claim No. 6-1; and CRE Claim No. 1-1.)

Among other things, the FDIC-R claimed that any amounts received by the consolidated group for tax refunds "will be held in trust for the Bank."  (Attachments to Original FDIC-R Proofs of Claim, at 4, BUFC Claim No. 103; BUFS Claim No. 6; and CRE Claim No. 1.)

The FDIC-R amended its Original FDIC-R Proofs of Claim on August 26, 2010 by the filing of amended proofs of claim in each of BUFC, BUFS, and CRE's bankruptcy cases, as amended claims No. 103, 6, and 1, respectively, each of which appear identical in all material respects (collectively, the "**FDIC-R Proofs of Claim**").  (BUFC Claim No. 103-2; BUFS Claim No. 6-2; and CRE Claim No. 1-2.)

As in the Original FDIC-R Proofs of Claim, the FDIC-R claimed in the FDIC-R Proofs of Claim that any amounts received by the consolidated group for tax refunds "will be held in trust for the Bank."  (Attachments to FDIC-R Proofs of Claim, at 4, BUFC Claim No. 103; BUFS Claim No. 6; and CRE Claim No. 1.)

D.    The Tax Refunds

Under the Tax Sharing Agreement, BUFC as the common parent under the Tax Sharing Agreement filed, from time to time, consolidated tax returns for itself and its consolidated subsidiaries (including BUFSB).  In accordance with Treasury Regulation §1.1502-75(h)(1), BUFC had the exclusive right and obligation to file the annual Federal tax return for itself and its consolidated subsidiaries (including BUFSB).  This requirement is consistent with the recognition in the Treasury Regulations that BUFC, as the common parent, was the sole taxpayer on behalf of its consolidated group.  Further evidence of this recognition is found under Treasury Regulation §§1.1502-77(a)(1) and 1.1502-77(a)(2), which provide that (i) the common parent is the "sole agent" for the consolidated group with respect to "all matters relating to the tax

liability" for each taxable year, (ii) "[a]ll correspondence concerning the income tax liability for the consolidated return year is carried on directly with the common parent," and (iii) "*any refund is made directly to and in the name of the common parent.*"  (Emphasis added.)  Pursuant to the foregoing, BUFC has been required to file all corporate tax returns and receive all refunds on behalf of its consolidated group.[2]

BUFC filed a certain consolidated tax return titled "Amended U.S. Corporation Income Tax Return" for the fiscal year ended September 30, 2008 on Form 1120X filed by "BankUnited Financial Corp & Subs C/O DSI" on or about September 10, 2009 (the "**Amended FY 2007 Return**").  (*Declaration of Joseph J. Luzinski* (the "**Decl.**") ¶ 7; a true and correct copy of the Decl. is annexed hereto as **Exhibit** "**A**.")  In conjunction with the filing of the Amended FY 2007 Return, on September 30, 2009, BUFC filed a Form 1139 "Corporation Application for Tentative Refund" ("**Form 1139**") through which it claimed a refund of $5,566,878 (the "**FY 2007 Refund**").  (Decl. ¶ 8.)

BUFC also filed a certain consolidated tax return titled "U.S. Corporate Income Tax Return" for the fiscal year ended September 30, 2009 on Form 1120 filed by "BankUnited Financial Corporation and Subsidiaries" on or about June 14, 2010 (the "**FY 2008 Return**" together with the Amended FY 2007 Return, the "**Tax Returns**").  (Decl. ¶ 10.)  In conjunction with the filing of the FY 2008 Return, on June 17, 2010, BUFC filed a Form 1139 through which it claimed a refund of $42,552,226 (the "**FY 2008 Refund**" together with the FY 2007 Refund,

---

[2]     Although Treasury Regulation §301.6402-7(g) would allow the IRS to pay a refund to a receivership for an insolvent bank if the refund were, as determined by the IRS, attributable to the net operating losses of the bank -- and not the common parent of such bank -- this regulation would apply only after a bank became insolvent and subject to a receivership. Thus, this regulation certainly was not applicable when the Tax Sharing Agreement was executed in 1997 and, as such, should not be relevant to the analysis of this agreement.

the "**Tax Refunds**")[3] for taxes paid in fiscal years 2003 (fiscal year ending September 30, 2004), 2005 (fiscal year ending September 30, 2006), and 2006 (fiscal year ending September 30, 2007) (the "**FY 2008 Refund Claim**") (Decl. ¶ 11), representing the maximum refund available to the consolidated taxpayer group headed by BUFC.[4]

BUFC has requested the issuance of a wire transfer from the United States Treasury to BUFC in the amount of the FY 2007 Refund,[5] and by filing the FY 2008 Refund Claim, BUFC has requested the issuance of the FY 2008 Refund.

On October 29, 2009, the Debtors and the FDIC-R stipulated to deposit any Tax Refunds in an escrow account pending determination of the ownership of those refunds, by entry into that certain *Stipulation Between the Debtors and the Federal Insurance Deposit Corporation with Respect to the Establishment of an Escrow Account* (the "**Tax Escrow Stipulation**"). This Court approved the Tax Escrow Stipulation by entry of its *Order Approving Stipulation Between*

---

[3]  It is anticipated by the Debtors and the FDIC-R that there may be other refunds issued by the United States Treasury and/or by the taxing authorities of different states or municipalities with respect to BUFC and its consolidated subsidiaries (including BUFS, CRE, and BUFSB). To the extent that any other refunds may prove to be due and owing, BUFC's entitlement to those refunds would rest on the same agreement and authorities as relied upon in this Motion.

[4]  As more fully described in the *Debtors' Response and Objection to Amended Motion of the Federal Deposit Insurance Corporation for an Order Confirming That the Automatic Stay Does Not Apply to the Exercise of Certain Tax Rights or, in the Alternative, for an Order Granting Relief From the Automatic Stay* (the "**Response to Amended Stay Relief Motion**") filed in the underlying Chapter 11 cases on October 22, 2010, the FDIC-Receiver filed a Form 56-F with the IRS on June 11, 2009, without seeking or obtaining relief from the automatic stay to do so. Based upon the submission of the Form 56-F – which was untimely even if the FDIC-Receiver had obtained stay relief to file it – the IRS rejected the Debtors' FY 2008 Refund Claim. In order to avoid any further delay in the process of obtaining the Tax Refunds, on or about October 7, 2010 BUFC filed with the IRS three Amended U.S. Corporation Income Tax Return Forms 1120X for the tax years ending September 2004, September 2006, and September 2007, seeking total refunds of $44,815,082. (Decl. ¶ 13.) As described in the Response to the Amended Stay Relief Motion, intervening guidance from the IRS resulted in an increase in the FY 2008 Refund sought.

[5]  The FY 2007 Refund has been approved by the Joint Congressional Committee on Taxation. (Decl. ¶ 9.)

*Debtors and the Federal Deposit Insurance Corporation with Respect to the Establishment of an*

*Escrow Account* (the "**Tax Escrow Order**") on November 25, 2009.[6]

E.    This Adversary Proceeding

As set forth in the FDIC-R Proof of Claim, the FDIC-R believes the Tax Refunds are

held in trust by BUFC for BUFSB.  The FDIC-R has also advanced its belief that the tax refunds

are held in trust in two prior submissions to this Court.[7]

The Debtors believe, however, that under the Tax Sharing Agreement, the Tax Refunds

are property of the BUFC Chapter 11 Estate and that the FDIC-R holds at most a general

unsecured claim for any amounts due from BUFC in respect of BUFSB's allocation of the tax

refunds under the Tax Sharing Agreement.[8]

Count I of the Complaint objects to the FDIC-R Proof of Claim, including the FDIC-R's

assertion of any interest in the Tax Refunds other than that as the holder of a general unsecured

claim against the BUFC Chapter 11 estate.   Count II of the Complaint seeks a declaratory

judgment that the Tax Refunds are property of the BUFC Chapter 11 estate, that the Tax Refunds

are not held in trust for the FDIC-R, and that the FDIC-R's only interest, if any, in the Tax

Refunds is as a holder of a general unsecured claim against the BUFC Chapter 11 estate.

---

[6]    Plaintiffs respectfully request that the Court take judicial notice of the Tax Escrow Stipulation and Tax Escrow Order as filed in the Debtor's bankruptcy case at Exhibit "A" to docket entry number 339 and docket entry number 378, respectively.  *See* Fed. R. Evid. 201.

[7]    *Motion of the Federal Deposit Insurance Corporation for an Order Confirming that the Automatic Stay Does not Apply for the Exercise of Certain Tax Rights or, in the Alternative, for an Order Granting Relief from the Automatic Stay* [Bankr. D.E. 574] (the "**Stay Relief Motion**") ¶45; *Defendant's Reply, Responding to Plaintiff's Opposition to, and in Further Support of, Defendant's Motion for a More Definite Statement of Count I and to Dismiss Count II of the Plaintiff's Adversary Complaint* [Adv. D.E. 58] (the "**Jurisdiction Reply**") at 7-8.  *See also Amended Motion of the Federal Deposit Insurance Corporation for an Order Confirming that the Automatic Stay Does Not Apply to the Exercise of Certain Tax Rights or, in the Alternative, for an Order Granting Relief from the Automatic Stay* [Bankr. D.E. 683] at 15 n.13.

[8]    Any such claim, of course, remains unliquidated as to amount and subject to disallowance under 11 U.S.C. §502(d) or on any other legal or factual basis.

### Memorandum of Law

**A.      Summary Judgment is proper as there are no genuine issues of material fact.**

Pursuant to Federal Rule of Civil Procedure 56, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re Optical Technologies, Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001). "If a reasonable jury could not find in favor of the non-moving party, no genuine issue of material fact does exist; and summary judgment is proper." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004). "A mere scintilla of evidence in support of the non-moving party will not suffice to overcome a motion for summary judgment," nor will mere conclusory allegations devoid of any factual support. *Id.* To avoid summary judgment, the non-moving party must come forward with affidavits or other competent evidence setting forth specific facts that show there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Here, there is no genuine issue of material fact as BUFC's entitlement to the Tax Refunds arises as a matter of law from the Tax Sharing Agreement, which is attached to the FDIC-R's Proofs of Claim.

**B.      BUFC's interest in the Tax Refund is property of BUFC's Chapter 11 estate.**

Section 541(a)(1) of the Bankruptcy Code provides that upon the commencement of a bankruptcy case, an estate is created comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." The ambit of property of the estate is broad. *United States v. Whiting Pools*, 462 U.S. 198 (1983). Section 541(d), however, carves out from a Chapter 11 estate "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest"; such property "becomes property of the estate . . . only to the extent of the debtor's legal title to such property,

but not to the extent of any equitable interest in such property that the debtor does not hold." The beneficial interest of property that is held in an express or constructive trust is not property of the estate. *City National Bank of Miami v. General Coffee Corporation (In re General Coffee Corporation)*, 828 F.2d 699, 706 (11th Cir. 1987).

The dispute between the Debtors and the FDIC-R revolves around the nature of each party's interest in the Tax Refunds: whether that portion of the Tax Refunds owed by BUFC to BUFSB is held in trust by BUFC for BUFSB or whether BUFC's obligation to pay that portion of the Tax Refunds to BUFSB is simply an obligation to pay an ordinary contract debt. If the Tax Refunds are held in trust, then each of the estates and the FDIC-R hold a beneficial interest in the Tax Refund to the extent that such interest can be established.[9] If not, then the FDIC-R's interest in the Tax Refunds is that of a holder of a general unsecured claim arising under the Tax Sharing Agreement, and the FDIC-R must share the Tax Refunds with BUFC's other creditors.

**C.    The Tax Sharing Agreement determines the respective rights of BUFC and BUFSB to the Tax Refunds.**

The federal tax laws are silent as to whether a tax refund or other tax attribute is property of the parent or the subsidiary of a consolidated group. *Superintendent v. Ochs (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004). While Treas. Reg. § 1.1502-77 speaks of the "agency" of the parent as the filer of the group's consolidated tax returns, this "agency" is for the convenience of the IRS only, and it does not alter or determine the underlying substantive rights among members of the consolidated taxpayer group. *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 (8th Cir. 1978).

---

[9]    Nothing contained herein is intended to limit or restrict the right of the Debtors, in their sole discretion, to amend the Tax Returns.

The two recent cases in which bankruptcy courts have addressed this issue are both consistent with this principle. *Zucker v. F.D.I.C. (In re NetBank, Inc.)*, Adv. No. 3:08-ap-00346-JAF, at 12 (Bankr. M.D. Fla. Sep. 30, 2010) ("the designation in § 1.1502-77 of the common parent of a consolidated group as agent for each member of the group is solely for the convenience and protection of the Internal Revenue Service and is not intended to affect the determination of the entity to which a tax refund belongs");[10] *In re Team Financial, Inc.*, 2010 WL 1730681, at *6 (Bankr. D. Kan. Apr. 27, 2010) (Treas. Reg. § 1.1502-77 simply makes "the common parent of the affiliated entities 'the spokesman' for the group"). Thus, the fact that BUFC acts as a "spokesman" or procedural "agent" for the consolidated group under Treas. Reg. § 1.1502-77 in filing the return does not determine, alter, or affect BUFC's or BUFSB's rights in and to the Tax Refunds.

More generally, nothing in the IRC or the Treasury Regulations determines the respective substantive rights of the members of a consolidated group to a tax refund. *Capital Bancshares, Inc. v. FDIC-R*, 957 F.2d 203, 207 (5th Cir. 1992) ("[T]he I.R.C. is silent as to whether a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving"); *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc.)*, 473 F.2d 262, 264 (9th Cir. 1973) ("there is nothing in the [Internal Revenue] Code or Regulations that compels the conclusion that a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving") (alterations in original; quotations omitted). State law, not federal tax law, determines the substantive rights of the parties. *See Ochs*, 377 F.3d at 212 (finding that state law controls in holding that where a tax sharing

---

[10]   A copy of the *NetBank* memorandum opinion is annexed hereto as **Exhibit** "**B**." The *NetBank* decision is presently on appeal.

agreement exists the equitable remedy of a constructive trust could not be imposed upon a tax refund paid to the debtor/parent of a consolidated group); *Jump*, 579 F.2d at 452 (in the absence of controlling federal law, state law controls).

A parent and subsidiary are free under Delaware law to determine their respective rights in and to any tax benefits by an express agreement, subject only to the business judgment standard. *In re Marvel Entertainment Group, Inc.*, 273 B.R. 58, 78-79 (D. Del. 2002) (citing *Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789, 794 (Del. Ch. 1967)). This rule—that as a matter of state law a parent and subsidiary are free to determine their respective rights in and to any tax benefits—has been applied to hold that a tax sharing agreement between a parent and subsidiary determines those parties' rights to tax refunds. *Ochs*, 269 B.R. at 490 ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement.").

This rule has been recently applied numerous times to the precise context here: a dispute between a bank holding company and the FDIC-R over the parties relative rights in and to tax refunds. *NetBank*, Adv. No. 3:08-ap-00346-JAF, at 13-14 ("the members of [a consolidated] group may allocate [tax] rights under an agreement, in which case, the agreement will control"); *In re Team Financial, Inc.*, 2010 WL 1730681, at *8 (Bankr. D. Kan. Apr. 27, 2010) (holding that a tax refund was property of the bankruptcy estate of the parent of the consolidated tax group where the tax sharing agreement "creates 'ordinary contractual obligations' between [parent] and the members with respect to tax liability and tax refunds");[11] *In re Franklin Sav. Corp.*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993) (holding that a tax sharing agreement controls the

---

[11]   The bankruptcy court entered on June 11, 2010 an *Agreed Order Partially Granting Motion by the FDIC-R to Clarify, Vacate, Alter, or Amend the Court's April 28, 2010 Memorandum Opinion*. Paragraph 2 of this Order provides that the "Court's conclusions of law in the Memorandum Opinion may change based on additional evidence that may be admitted later in this proceeding." Although the Court has left open the possibility that its legal conclusions "may change," it has not actually altered those conclusions at this time.

respective rights of a parent and subsidiary to a tax refund unless the agreement is the product of "gross and palpable overreaching"), *aff'd,* 182 B.R. 859 (D. Kan. 1995) (affirming that where a tax allocation "agreement speaks specifically to the allocation of any tax refunds," the agreement controls the respective rights of the parent and subsidiary to any tax refund); *In re MCorp Fin. Inc.*, 170 B.R. 899, 902 (S.D. Tex. 1994) (finding that a tax sharing agreement "created an account, a debtor-creditor relation, which is the quintessential business of bankruptcy"; "The refund must be paid to the estate; then if [the failed subsidiary bank] is the owner and wants to enforce its property right, it must file a claim."). Thus, where a tax sharing agreement exists between a bank holding company and a bank, that agreement controls the determination of the respective rights of the parties in and to any tax refund.

In prior pleadings with this Court, the FDIC-R, citing a lengthy list of cases, has asserted that "a member of the consolidated group is entitled to a tax refund arising from the filing of a consolidated tax return, where the refund sought constitutes either taxes paid by the consolidated tax group member or losses sustained by that member in the years at issue." Jurisdictional Reply at 7; Stay Relief Motion ¶ 44. Whatever merit these cases may have where **no** tax sharing agreement exists between the parent and subsidiary, they are inapplicable where, as here, a tax sharing agreement exists between the parent and subsidiary. Curiously, the FDIC-R's prior filings asserting its entitlement to some or all of the Tax Refund scrupulously avoid any reference to the myriad of cases in which a tax sharing agreement governs the respective rights of the parent and subsidiary. The primacy of a tax sharing agreement is recognized even by *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc.)*, 473 F.2d 262, 264 (9th Cir. 1973), the leading case relied upon by the FDIC-R: "Normally,

where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability."

Accordingly, the Tax Sharing Agreement between BUFC and BUFSB determines the respective rights of BUFC and BUFSB to the Tax Refunds.

**D.    The Tax Sharing Agreement establishes a debtor-creditor relationship between BUFC and BUFSB, and BUFSB's interest in the Tax Refunds is therefore simply as a general unsecured creditor.**

The language of the Tax Sharing Agreement establishes that the agreement created a debtor-creditor relationship between the parties, and not a trust or agency relationship with respect to any refund.  Courts addressing the issue of the construction of tax sharing agreements have focused on the language of the agreement to determine the respective rights of the parties. *Ochs*, 269 B.R. at 498 (holding that a debtor-creditor relationship arose under a tax sharing agreement where the language of the agreement shows "an intent to create ordinary contractual obligations between the parties"); *Franklin Sav. Corp.*, 159 B.R. at 29 (examining the language of a tax sharing agreement and determining the agreement gave rise to a debtor-creditor relationship).  In examining the language of tax allocation agreements, courts have found the use of certain terms like "receivable," "payable," "settlement," and "reimbursement" to demonstrate that the parties intended a debtor-creditor relationship.  *See Ochs*, 269 B.R. at 497-98; *Franklin Sav. Corp.*, 159 B.R. at 29.  *See also MCorp Fin., Inc.*, 170 B.R. at 902 (construing a tax sharing agreement to create an "account" and a "debtor-creditor relation").

A debtor-creditor relationship arises between parties to a tax sharing agreement where the tax sharing agreement is written using terms evidencing an intention to establish such a relationship.  For example, in *Ochs*, the bankruptcy court determined that a debtor-creditor relationship arose from a tax sharing agreement that provided for "settlement" of the obligations within thirty days.  269 B.R. at 497-98.  The bankruptcy court viewed the provision for

"settlement" as creating an "open, mutual account." *Id.* at 498 (citing *Rodgers v. Roulette Records, Inc.*, 677 F. Supp. 731, 735 (S.D.N.Y. 1988)).  The bankruptcy court also reasoned that the provision of thirty days to effect such "settlement" was consistent with a debtor-creditor relationship.  Id. at 497; *see also NetBank*, Adv. No. 3:08-ap-00346-JAF, at 17 (reasoning that 30-day settlement provision evidences a debtor-creditor relationship).

Similarly, in *Franklin Savings Corporation*, the bankruptcy court determined that a tax sharing agreement that provided for "reimbursement" and "credits" of a tax refund from a Chapter 11 debtor-parent to its subsidiary created a debtor-creditor relationship.  159 B.R. at 29. The court reasoned that a debtor-creditor relationship arose because the use of the term "reimbursement" was more consistent with creating a "debt" or a "receivable" than vesting "ownership" with the subsidiary.  *Id.*  On appeal the district court affirmed the bankruptcy court's construction of the tax sharing agreement, on the basis that funds to be "reimbursed" were not held in trust and the use of the term "reimbursement" gave rise to a debtor-creditor relationship.  182 B.R. at 863.  The district court added that the absence of the term "ownership" and an express term vesting ownership of the tax refunds did not render ambiguous the use of the term "reimbursement."  *Id.; see also Team Financial*, 2010 WL 1730681, at *11 (holding that a tax sharing agreement using the terms "compensating, "shall pay," and "shall be payable" established that the tax sharing agreement created ordinary debtor-creditor relationships between the members of the consolidated group).

Moreover, in examining tax sharing agreements, courts have also found the absence of certain terms or provisions instructive.  In *Ochs*, the bankruptcy court reasoned that the absence of any language indicating an intent by the parties to create an agency relationship or a trust and the absence of any provision for the segregation of funds or other restriction on the use of funds

evidenced the existence of indebtedness, *i.e.*, a debtor-creditor relationship. 269 B.R. at 494. The bankruptcy court in *Team Financial* similarly reasoned that the absence of any language within "the four corners" of the tax sharing agreement expressly identifying the parent or any other member of the consolidated group as trustee or any property as a trust *res* was conclusive that the parties did not intend to create a trust. *Team Financial*, 2010 WL 1730681, at *5 and *11. The bankruptcy court in *NetBank* also relied on the absences of express trust, segregation, or escrow language to determine the parties did not intend to create a trust. Adv. No. 3:08-ap-00347-JAF, at 17-18.

Here, the Tax Sharing Agreement between BUFC and BUFSB speaks **entirely and exclusively** in the language of a debtor-creditor relationship, using operative terms such as "inter-company," "receivable," "payable," "settlement" and "reimbursement." Tax Sharing Agreement §§ 3-5. "Settlement" and "reimbursement" have been found to demonstrate a debtor-creditor relationship. *See Ochs*, 269 B.R. at 498; *Franklin Sav. Corp.*, 159 B.R. at 29. Likewise, the plain meaning of the terms "receivable," "payable" and "inter-company" also reflect a debtor-creditor relationship.

The operation of these terms in the Tax Sharing Agreement creates open, mutual accounts between and among the members of the consolidated group. Specifically, the agreement provides that the members of the group "shall record an inter-company income tax receivable or payable." Tax Sharing Agreement § 3. After settlement of these inter-company receivables and payables, any member with a "net inter-company payable" is to pay that payable as "reimbursement," and any member with a "net inter-company tax receivable" is to be reimbursed. *Id.* This "settlement" is to occur within 30 days of payment of taxes or receipt of a refund. *Id.* The Tax Sharing Agreement provides for a netting of mutual accounts within thirty

days, clearly evidencing a debtor-creditor relationship rather than a trust or agency agreement whereby BUFC could be deemed to hold any refund in trust for BUFSB. *See Ochs*, 269 B.R. at 498.

Finally, the terms "agency" or "trust" do not appear in the Tax Sharing Agreement, nor do any terms of similar meaning. The Tax Sharing Agreement does not provide for the segregation of funds or otherwise restrict the use of the funds. The absence of these terms and provisions further demonstrates that a debtor-creditor relationship arises under the Tax Sharing Agreement. *Ochs*, 269 B.R. at 496-97.

Accordingly, because the Tax Sharing Agreement must be construed to create a debtor-creditor relationship between BUFC and BUFSB, the interest of the FDIC-R in the tax refund is limited to that of a holder of a pre-petition claim against BUFC's estate.

**E.    No basis exists for placing the Tax Refunds in either an express or constructive trust.**

**i.    The Tax Refunds are not held in trust for the benefit of BUFSB under either tax law or the *Bob Richards* line of cases.**

In two prior submissions with this Court, the FDIC-R, relying on the unpublished decision in *In re BSD Bancorp, Inc.*, Case No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995), has asserted that the Tax Refunds are held by BUFC in trust for BUFSB because a principal-agent relationship arose pursuant to Treas. Reg. § 1.1502-77 between BUFC and BUFSB as a matter of law under the *Bob Richards* line of cases, and that parties to tax sharing agreements may not contract around the rule that the tax refunds are held in trust unless an intent to do so is "expressly or impliedly manifested in a written agreement" that comports with "economic reality". Stay Relief Motion ¶ 45; Jurisdiction Reply at 7-8. This argument fails for three reasons.

First, as set forth above, any "agency" under Treas. Reg. 1-1502.77 is merely procedural and does not determine or alter the substantive rights of the members of a consolidated group to the group's tax refunds.  *See supra* § C.  Second, as *Bob Richards* and the cases following it recognize, where a tax sharing agreement exists the terms of that agreement determine the relative rights of the parties to any tax refund due under the agreement.  Third, to the extent *Bob Richards* is an expression of federal common law overruling the state-law rules that parties may freely allocate tax attributes by contract, *Bob Richards* has been effectively eviscerated by the Supreme Court in *Atherton v. F.D.I.C.*, 519 U.S. 213 (1997).

As set forth above, *Bob Richards* itself expressly recognizes that its rule does not apply where a tax sharing agreement exists and that instead the terms of the agreement determine the rights of the parties to any tax refund.  *See supra* § C (citing *Bob Richards*, 473 F.3d at 264 ("Normally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability.")).  Moreover, the cases following *Bob Richards* also recognize that when a tax sharing agreement exists, the agreement controls.  *See*, *e.g.*, *Capital Bancshares*, 957 F.2d at 207 ("courts will not question an allocation which results from an express agreement, or an agreement which is clearly implied.  No such agreement exists in this case, however."); *Jump*, 579 F.2d at 454 ("absent an express agreement," subsidiary not entitled to a refund generated in part by other members of the consolidated group"); *In re Revco D.S., Inc.*, 111 B.R. 631, 638 (Bankr. N.D. Ohio 1990) (where no "express or implied agreement" existed, subsidiary was entitled to tax refund generated by its losses); *In re Florida Park Banks, Inc.*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990) (applying *Bob Richards* and unjust enrichment principles only after finding that "there is no agreement between the parties as to the allocation of the tax refunds").

Thus, the *Bob Richards* line of cases uniformly recognize the primacy of a tax sharing agreement where one exists.

*BSD Bancorp*, relied on by the FDIC-R in its prior submissions, is not to the contrary and actually confirms this well-established principle.   Although *BSD Bancorp* held that the tax refunds at issue there were held in trust by the parent for the subsidiary, that holding flowed from the terms of the tax sharing agreement itself.   *Id.* at 12.   The decision was based upon a determination that the plain terms of the tax sharing agreement did not create a debtor-creditor relationship, *id.*, where the agreement provided as follows:

> Refunds due subsidiaries from the Company which cannot be fully funded when due then will be carried on the subsidiary's books as a "loan to parent" and will accrue interest at not less than the Federal Funds Rate.   The occurrence of this event **is unusual and its likelihood of happening is considered remote**.

*Id.* at 5 (emphasis added).   The tax sharing agreement specifically provided for a limited circumstance in which a debtor-creditor relationship arose between the parent and subsidiary and described those circumstances as "unusual."   In analyzing whether a debtor-creditor relationship arose between the parent and the subsidiary under this agreement, the *BSD Bancorp* court focused on the language from the tax sharing agreement, and in particular, the use of the term "unusual."   *Id.* at 11.   The use of this term "unusual" in connection with a sole provision allowing for borrowing between the parent and the subsidiary in only limited circumstances suggested to the *BSD Bancorp* court that the parties' intention under that tax sharing agreement was to create a debtor-creditor relationship only in that circumstance, and the *BSD Bancorp* court therefore construed the tax sharing agreement to give rise to a debtor-creditor relationship only in that limited circumstance.   *Id.* at 12.   Moreover, the *BSD Bancorp* court found that as to other matters, the parties' intent as reflected in the language of the tax sharing agreement "strongly suggests an intent to maintain a principal-agent relationship[.]"   *Id.* at 11.   Because *BSD Bancorp*

relied upon the language of the tax sharing agreement the decision confirms the primacy of the Tax Sharing Agreement. But *BSD Bancorp* otherwise has no relevance here, as the plain terms of the agreement in that case differ greatly from the terms of BUFC's Tax Sharing Agreement.[12]

Moreover, to the extent *BSD Bancorp* is correct that *Bob Richards* is an exercise in federal common law making, *BSD Bancorp*, Case No. 93-12207-A11, at 4 (*Bob Richards*' "holding is thus apparently federal common law"), and that a federal-common-law rule determines that the portion of a tax refund attributable to the income or loss of the subsidiary is held in trust by the parent, the Supreme Court's subsequent decision in *Atherton v. F.D.I.C.* eviscerates *Bob Richards* and *BSD Bancorp*. In *Atherton v. FDIC-R*, the United States Supreme Court considered whether federal common law provided the applicable legal standard for breach of fiduciary duty claims against the officers and directors of a federally chartered bank. *Id.* at 217. No applicable federal statute or regulation set forth general corporate governance standards. *Id.* at 219. Therefore, setting the applicable legal standard invoked federal common law in the "strictest sense, i.e., a rule of decision that amounts, not simply to an interpretation of a federal statute or a properly promulgated administrative rule, but, rather, to the judicial 'creation' of a special federal rule of decision." *Id.* at 218. To create such a special federal rule of decision, however, "a significant conflict between some federal policy or interest and the use of state law must first be specifically shown. Indeed, such a conflict is normally a precondition." *Id.* (citations and alterations omitted).

The Supreme Court found "no significant conflict with, or threat to, a federal interest, and therefore no basis to create a federal rule of decision. *Id.* at 225. The Court specifically rejected

---

[12]    Although *BSD Bancorp* speaks in terms of "economic reality," it is clear that *BSD Bancorp* construed the contract in light of its plain terms and that *BSD Bancorp* does not depart from the bedrock principle of contract law that the effect of a contract is determined in light of the intentions of the parties as expressed in their written agreement.

the notion that a significant conflict arose from the need for "uniformity"; from the fact that the banks at issue were federally chartered; or from the federal statutes and regulations empowering the OTS to fine or remove the bank's officers and directors. *Id.* at 219-25. In sum, the Supreme Court found that "federal need is far weaker than was present in what the Court has called the few and restricted instances in which this Court has created a federal common law." *Id.* at 225 (citations and quotations omitted).

As no federal statute or regulation supplies the rule that the parent of a consolidated group holds tax refunds in trust for its subsidiaries,[13] it could only exist as an exercise in federal common law in the strictest sense, i.e., supplying a judicially created federal rule of decision. *See Atherton*, 519 U.S. at 218. However, it would appear that as with the applicable standard of care for a federally chartered institution's officers and directors, there is no significant conflict between some federal interest and the use of state law that justifies the judicial creation of a federal rule of decision for the allocation of a tax refund between a parent and subsidiary. *See id.* at 219-225. Thus, the judicially created rule of decision in the *Bob Richards* line of cases does not rise to the level of the "few and restricted instances" in which the Supreme Court has sanctioned the creation of federal common law, and the *Bob Richards'* line of cases is no longer good law after *Atherton v. FDIC-R*. *See id.* at 225.

**ii.** **The existence of the Tax Sharing Agreement precludes the imposition of a constructive trust over the Tax Refunds.**

The Second Circuit has squarely addressed the issue whether a constructive trust can be imposed over that portion of a tax refund due by a parent to its subsidiary where the parties have determined their rights to the tax refund under a written agreement. In *Ochs*, on facts similar to those present here, the bankruptcy court held that the receiver of an insolvent insurance company

---

[13]    This rule does **not** arise from Treas. Reg. §1.1502-77 or the Internal Revenue Code. *See supra* § C.

subsidiary was an ordinary creditor holding a claim against the bankruptcy estate of the parent holding company.  269 B.R. at 495.  The debtor-creditor relationship arose from the parties' intent, as expressed by the plain terms of the tax sharing agreement, to create only an ordinary contractual relationship.  *Id.*  In light of that agreement, the bankruptcy court rejected the arguments of the subsidiary's receiver that the parent stood in a fiduciary or agency capacity or that the subsidiary was entitled to impose a constructive trust over amounts due under the tax sharing agreement.  *Id.* at 497-98 & 500-01.  Instead, the subsidiary's receiver was allowed to file "any claim consistent with this ruling that the [receiver] may assert as a creditor in [the] bankruptcy case."  *Id.* at 502.

The Second Circuit affirmed.  *Ochs*, 377 F.3d at 211.  The issue on appeal was "whether a constructive trust is an appropriate remedy when the rights of the parties are structured by a written agreement."  *Id.* at 213.  The Court declined to impose the equitable remedy of a constructive trust on the basis that an adequate remedy at law exists where a valid agreement structures the rights and obligations of the parties.  *Id.* at 215.[14]

The Court also held that a constructive trust is "fraud-rectifying rather than intent-enforcing," *id.* at 216, and therefore inappropriate where the parties had chosen to express their intentions in a written agreement.  Noting that in bankruptcy the expectations of a debtor's creditors are frustrated by the debtor's insolvency, neither that condition nor the debtor's consequent failure to honor its obligations constituted misconduct to which the "fraud-rectifying" principles of constructive trust law applied.  *Id.*  Rather, to allow a particular creditor to invoke constructive trust law to create a separate allocation mechanism and thereby

---

[14]  Although the *Ochs* case was decided under New York law, Delaware law, which governs this dispute, also holds that no claim for constructive trust lies where there is an adequate remedy at law.  *See, e.g.*, *McMahon v. New Castle Assocs.*, 532 A.2d 601, 609 (Del. Ch. 1987) (choosing to "remain undazzeled by labels," the court denied request for constructive trust on the basis that the plaintiff's "remedy at law is fully adequate to redress any valid claim that may be presented by his complaint").

circumvent the bankruptcy process "would wreak havoc with the priority system ordained by the Bankruptcy Code," frustrating the principle purposes of the bankruptcy system to ensure an "equal distribution among creditors" and to "protect the creditors from one another." *Id.* at 217 (citations and ellipses omitted).

Upon the foregoing analysis, the Court noted that constructive trusts are disfavored in bankruptcy. *Id.* at 218. Outside of bankruptcy, a constructive trust may be appropriate to enforce an unfulfilled obligation to prevent enrichment of a solvent entity. *Id.* But bankruptcy is fundamentally different. *Id.* In bankruptcy, the assets of the insolvent debtor are marshaled under court supervision for distribution in accordance with federal law to provide fair but not full returns to the debtor's unsecured creditors. *Id.* Fundamentally, it is not unjust to require a creditor of an insolvent debtor to be paid in accordance with the priority scheme established by the Bankruptcy Code. *Id.* This is so because the "equities of bankruptcy are not the equities of the common law." *Id.* (citation omitted).

This result is consistent with the leading case in the Eleventh Circuit on the imposition of constructive trusts in bankruptcy. In *City National Bank of Miami v. General Coffee Corporation (In re General Coffee Corporation)*, 828 F.2d 699 (11th Cir. 1987), the Eleventh Circuit imposed a constructive trust over funds the debtor had obtained through a pre-petition fraud and held that the funds were therefore not property of the estate. *Id.* at 704. *General Coffee* therefore stands for the unsurprising proposition that where the debtor acquires property by way of a pre-petition act of fraud a constructive trust is an appropriate fraud-rectifying remedy, and that the *res* subject to the pre-petition constructive trust does not become property of the estate.

Here, that proposition does not apply to the tax refund. There is no fraud to rectify. The failure of BUFC to pay to the FDIC-R any or all of the tax refund is a result of the application of the Bankruptcy Code to the current circumstances, and certainly not the product of any fraud. Moreover, BUFSB has an adequate remedy at law in the form of a general unsecured claim against the BUFC estate arising from the pre-petition Tax Sharing Agreement.

<u>**Conclusion**</u>

The teaching of both *Ochs* and the *Bob Richards* cases as applied here is unambiguous: the Tax Sharing Agreement controls and determines the right to the tax refund as between BUFC and BUFSB. It is equally unambiguous in light of the language used in the Tax Sharing Agreement that the parties intended to create a debtor-creditor relationship between BUFC and BUFSB. Under the Tax Sharing Agreement, the FDIC-R's interest in the Tax Refunds is to be paid as an ordinary debt. Accordingly, the FDIC-R's interest in the Tax Refund is simply that of a holder of an unsecured claim, and the FDIC-R must participate in the distribution of the Tax Refunds to all of BUFC's general unsecured creditors.

As the Second Circuit reasoned in *Ochs*, this result comports with the reality of BUFC's insolvency and the consequence that the expectations of general unsecured creditors are nearly always frustrated. While the FDIC-R "may understandably chafe at being required to accept less than it was otherwise entitled to receive under the [Tax Sharing] Agreement, the short—and conclusive—answer is that this is not injustice, it is bankruptcy." *Ochs*, 377 F.3d at 217.

WHEREFORE, Plaintiffs respectfully request the entry of an order (i) granting partial summary judgment on Count I in favor of Plaintiffs and against FDIC-R disallowing the claims asserting a direct entitlement to the Tax Refunds; (ii) granting final summary judgment on Count II in favor of Plaintiffs and against FDIC-R; and (iii) granting such other additional and further relief the Court deems just and proper.

Dated: October 22, 2010.                    Respectfully submitted,

                                            GREENBERG TRAURIG, P.A.
                                            Counsel for Plaintiffs
                                            1221 Brickell Avenue
                                            Miami, Florida 33131
                                            Telephone: (305) 579-0500
                                            Facsimile: (305) 579-0717


                                            By:_____/s/ Mark D. Bloom_____
                                                MARK D. BLOOM
                                                Florida Bar No. 303836
                                                bloomm@gtlaw.com
                                                JACQUELINE BECERRA
                                                Florida Bar No. 0025135
                                                becerraj@gtlaw.com
                                                SCOTT M. GROSSMAN
                                                Florida Bar No. 0176702
                                                grossmansm@gtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below via transmission of Notices of Electronic Filing generated by CM/ECF who are authorized to receive electronically Notices of Electronic Filing in this adversary proceeding.

/s/ Mark D. Bloom
MARK D. BLOOM

## SERVICE LIST

**Electronic Mail Notice List**

The following is the list of parties who are currently on the list to receive e-mail notice/service for this adversary proceeding:

**Bruce J Berman** on behalf of Defendant Federal Deposit Insurance Corporation, in its capacity as Receiver of BankUnited, FSB
bberman@mwe.com, wjanke@mwe.com; graicht@mwe.com; knorcross@fdic.gov; slevine@fdic.gov

**Mark D Bloom** on behalf of Plaintiff BU Realty Corporation
bloomm@gtlaw.com, phillipsj@gtlaw.com;MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com

**Scott M. Grossman** on behalf of Plaintiff BU Realty Corporation
grossmansm@gtlaw.com, phillipsj@gtlaw.com;MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com

**Sameer K Kapoor** on behalf of Intervenor Official Committee of Unsecured Creditors of BankUnited Financial Corporation and Related Debtors
skapoor@kilpatrickstockton.com, tmeyers@kilpatrickstockton.com; lcanty@kilpatrickstockton.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

BANKUNITED FINANCIAL
CORPORATION, et al.,[1]

    Debtors.

_____/

Case No. 09-19940-LMI

Chapter 11

Jointly Administered

BANKUNITED FINANCIAL
CORPORATION, BANKUNITED
FINANCIAL SERVICES, INC., CRE
AMERICA CORPORATION, and BU
REALTY CORPORATION,

    Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as Receiver
of BankUnited, FSB,

    Defendant.

_____/

Adv. No. 10-02872-LMI

**DECLARATION OF JOSEPH J. LUZINSKI IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON COUNT I OF THE COMPLAINT AND FOR
<u>SUMMARY JUDGMENT ON COUNT II OF THE COMPLAINT</u>**

I, JOSEPH J. LUZINSKI, declare and state as follows:

1.    My name is Joseph J. Luzinski.  I am over the age of 18 and have personal

knowledge of the facts set forth herein.

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): BankUnited Financial Corporation, a Florida corporation (7773); CRE America Corporation, a Florida corporation (0049); and BankUnited Financial Services, Incorporated, a Florida corporation (8335). The address of each of the Debtors is c/o Development Specialists, Inc., 200 South Biscayne Blvd., Suite 1818, Miami, FL 33131.

**EXHIBIT A**

2.      I submit this declaration in support of the motion for summary judgment filed by Plaintiffs BankUnited Financial Corporation ("BUFC"), BankUnited Financial Services, Inc. ("BUFS"), CRE America Corporation ("CRE") and BU Realty Corporation ("BU Realty") for partial summary judgment on Count I of and for summary judgment on Count II of the *Amended Complaint* [D.E. #67], which was filed against the Federal Deposit Insurance Corporation (the "FDIC") in its capacity as receiver for BankUnited FSB ("BUFSB").

3.      I am a Senior Vice President of Development Specialists, Inc. ("DSI"), a restructuring management and advisory services firm with offices located, among other locations, at 200 South Biscayne Boulevard, Suite 1818, Miami, Florida 33131-2329.

4.      DSI specializes in such areas as corporate finance, turnaround consultant, forensic accounting, and litigation support to distressed, insolvent and reorganizing businesses.

5.      On June 2, 2009, DSI was engaged to provide restructuring management services to BUFC, BUFS and CRE, and as part of that engagement, I was appointed Chief Restructuring Officer for BUFC, BUFS, and CRE.

6.      On July 7, 2009, I was appointed Chief Restructuring Officer of BU Realty.

7.      On or about September 10, 2009, BUFC filed a certain consolidated tax return titled "Amended US Corporation Income Tax Return" for the fiscal year ended September 30, 2008 on Form 1120X filed by "BankUnited Financial Corp. and Subs c/o DSI" (the "Amended FY 2007 Return"). A true and correct copy of the Amended FY 2007 Return will be filed under seal as Exhibit "1."

8.      In conjunction with the filing of the Amended FY 2007 Return, on September 30, 2009, BUFC filed a Form 1139 "Corporation Application for Tentative Refund" ("Form 1139")

through which it claimed a refund of $5,566,878 (the "FY 2007 Refund"). A true and correct copy of the Form 1139 will be filed under seal as Exhibit "2."

9.    On or about June 10, 2010, DSI received a letter dated May 27, 2010 from the Internal Revenue Service stating that the FY 2007 Return had been approved by the Joint Committee on Taxation. A true and correct copy of this letter is annexed hereto as Exhibit "3."

10.    On or about June 14, 2010, BUFC filed a certain consolidated tax return titled "US Corporation Income Tax Return" for the fiscal year ended September 30, 2009 on Form 1120 filed by BankUnited Financial Corporation and Subsidiaries" (the "FY 2008 Return"). A true and correct copy of the FY 2008 Return will be filed under seal as Exhibit "4."

11.    On June 17, 2010, in conjunction with the filing of the FY 2008 Return, BUFC filed a Form 1139 through which they claimed a refund of $42,552,226 (the "FY 2008 Refund") for taxes paid in fiscal years 2003 (fiscal year ending September 30, 2004), 2005 (fiscal year ending September 30, 2006), and 2006 (fiscal year ending September 30, 2007). A true and correct copy of the Form 1139 will be filed under seal as Exhibit "5."

12.    On August 23, 2010, the Debtors received correspondence from the IRS returning the claim for the Debtors' FY 2008 Refund. A true and correct copy of this correspondence is annexed hereto as Exhibit "6."

13.    On October 7, 2010, BUFC filed with the IRS three Amended U.S. Corporation Income Tax Return Forms 1120X for the tax years ending September 2004, September 2006, and September 2007, seeking total refunds of $44,815,082 (the "Amended FY 2008 Refund").  True and correct copies of the Forms 1120X will be filed under seal as Composite Exhibit "7."

Pursuant to 28 U.S.C. § 1746(2), I declare, under penalty of perjury that the foregoing is true and correct, on this **2 2** day of October, 2010.

_____
Joseph J. Luzinski

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                    :
                                          :
NETBANK, INC.,                            :        Case No. 3:07-bk-04295-JAF
                                          :
                                          :        Chapter 11
          Debtor.                         :
                                          :
                                          :
                                          :
_____          :
                                          :
CLIFFORD ZUCKER, in his capacity          :        Adversary Proceeding
as Liquidating Supervisor for             :        No. 3:08-ap-00346-JAF
NETBANK, INC.,                            :
                                          :
          Plaintiff,                      :
                                          :
v.                                        :
                                          :
FEDERAL DEPOSIT INSURANCE                 :
CORPORATION,[1]                           :
                                          :
          Defendant.                      :
                                          :
_____          :

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This proceeding came before the Court upon Plaintiff's Motion for Summary

Judgment, Defendant's Response to Plaintiff's Motion for Summary Judgment,

Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment,

Defendant's Motion for Summary Judgment, Plaintiff's Response in Opposition to

Defendant's Motion for Summary Judgment, and Defendant's Reply to Plaintiff's

# EXHIBIT B

Response to Defendant's Motion for Summary Judgment. Upon a review of the pleadings and the applicable law, the Court finds it appropriate to grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment. The following facts are undisputed.

**Undisputed Facts**

**Bankruptcy Case**

On September 28, 2007 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). On May 20, 2008, the Debtor filed the Debtor's Liquidating Plan of Reorganization [Docket No. 327], and on July 10, 2008 and July 31, 2008, the Debtor amended the proposed plan [Docket Nos. 402 and 420] (as amended, the "Plan"). On September 16, 2008, the Court entered an Order confirming the Plan [Docket No. 475].

Pursuant to the Plan, on the "Effective Date" (as defined therein), Mr. Clifford Zucker of J.H. Cohn LLP was appointed as the Liquidating Supervisor. The Liquidating Supervisor is the representative of the Debtor's bankruptcy estate, and, as a result, is authorized to investigate and, if necessary, prosecute, any causes of action belonging to the Debtor or its estate. The Effective Date of the Plan was September 29, 2008.

The Debtor is the parent corporation of a number of wholly-owned direct and indirect subsidiaries. Among the subsidiaries owned directly by the Debtor is NetBank, FSB, a federal savings bank (the "Bank"), which, in turn, owns the stock of several subsidiaries. The Court will refer to the Debtor and its direct and indirect subsidiaries,

---

[1] As discussed below, the United States of America has been dismissed from the instant adversary

including the Bank and the Bank's subsidiaries as the "Consolidated Group" and the Bank and its subsidiaries as the "Bank Affiliated Group."

Before its seizure in the fall of 2007, the Bank operated under the oversight of the Office of Thrift Supervision (the "OTS"), the quasi-governmental entity that is charged with regulatory oversight of federal savings banks. On September 28, 2007, the OTS appointed Defendant receiver for the Bank. That same day, the Debtor filed its Chapter 11 case in this Court.

### The Tax Refund

The Debtor and the other members of the Consolidated Group, including the Bank and the other members of the Bank Affiliated Group, are parties to an Amended and Restated Tax Sharing Agreement, effective January 1, 2003 (the "Tax Sharing Agreement"), which, in addition to conferring on the Debtor complete control over tax reporting, tax administration and the resolution of disputes with taxing authorities for the Consolidated Group, defines the methods by which tax liabilities and credits are allocated among the members of the Consolidated Group and paid. The Tax Sharing Agreement is governed by the laws of the State of Georgia. Tax Sharing Agreement at p. 8, §10(c).

As stated in the Tax Sharing Agreement, and within the meaning of section 1504(a) of the Internal Revenue Code, the Debtor is the common parent of the Consolidated Group, including the Bank Affiliated Group. Tax Sharing Agreement at p. 1. See 26 U.S.C. § 1504(a).

Section 9 of the Tax Sharing Agreement provides: Procedural Matters

---

proceeding.

3

NetBank[2] shall prepare and file the Consolidated Return and any other returns, documents or statement required to be filed with the IRS with respect to the determination of the Federal income tax liability of the NetBank Group. In its sole discretion, NetBank shall have the right with respect to any Consolidated Returns which it has filed or will file:

(a)      to determine (i) the manner in which such returns, documents or statements shall be prepared and filed, including, without limitation, the manner in which any item of income, gain, loss, deduction or credit shall be reported, (ii) whether any extensions may be requested, and (iii) the elections that will be made by any member Affiliate,

(b)      to contest, compromise or settle any adjustment or deficiency proposed (sic) asserted or assessed as a result of an audit of such returns by the IRS,

(c)      to file, prosecute, compromise or settle any claim the NetBank Affiliated Group may be entitled (sic) shall be paid by the way of refund or credited against the tax liability of the NetBank Group.[3]

Each Affiliate hereby irrevocably appoints NetBank as its agent and attorney-in-fact to take such action (including execution of documents) as NetBank may deem appropriate to effect the foregoing.

Tax Sharing Agreement at p. 7, §9.

On or about September 5, 2006, the Debtor filed a consolidated tax return for the tax year ending December 31, 2005 (the "2005 Tax Return"). As shown on the 2005 Tax Return, the Consolidated Group had taxable income of $17,987,259.00[4], and tax liability of $6,145,415.00. On or about August 31, 2007 the Debtor filed a consolidated tax return for the tax year ending December 31, 2006 (the "2006 Tax Return"). As shown on the

---

[2] In the Tax Sharing Agreement, the Debtor NetBank, Inc. is defined as "NetBank." Tax Sharing Agreement at p. 1, Preamble.
[3] Plaintiff submits that words were inadvertently omitted in subsection (c) and that subsection (c) was intended to read substantially as follows: "to file, prosecute, compromise or settle any claim [to which] the NetBank Affiliated Group may be entitled and [determine whether the claim] shall be paid by the way of refund or credited against the tax liability of the NetBank Group."
[4] The Bank Affiliated Group generated taxable income of $22,095,685 for the 2005 tax year. The Consolidated Group had a loss of $4,108,426.

4

2006 Tax Return, the Consolidated Group had a net operating loss of $94,128,552.00[5].
Therefore, the Consolidated Group had zero tax liability for 2006.

On September 4, 2007, the Debtor filed a Form 1139 for the tax year ending
December 31, 2006, seeking a refund of $5,735,176.00 attributable to the carryback of
the Consolidated Group's net operating loss incurred for its tax year ending December
31, 2006 to its tax year ending December 31, 2005 (the "Tax Refund"). On or about
November 26, 2007 Defendant, as receiver for the Bank, filed its own Form 1139,
requesting that the Internal Revenue Service (the "IRS") remit the Tax Refund to
Defendant.

By letter dated February 11, 2008 Defendant in its capacity as receiver for the
bank attempted to repudiate and disaffirm the Tax Sharing Agreement (the "February
2008 Notice"). On or about March 10, 2008, the Debtor sent a letter to the IRS informing
the IRS that the Tax Refund was property of the Debtor's estate, which should be paid to
the Debtor and not Defendant. On or about April 23, 2008 the IRS informed the Debtor
and Defendant that neither party's Form 1139 could be processed because, pursuant to
IRS regulations, an application for a carryback adjustment was required to be signed by
both the Debtor as the common parent of the Consolidated Group and Defendant as the
fiduciary for the Bank.

Subsequently, on or about June 11, 2008, the Debtor filed an 1120X, an amended
consolidated tax return on behalf of the Consolidated Group for the tax year ending
December 31, 2005, clarifying the calculation of the Tax Refund and seeking payment of

---

[5] The Bank Affiliated Group generated a net operating loss of $86,804,020 for the 2006 tax year. The

the same from the IRS. Thereafter, on or about June 18, 2008 Defendant filed an 1120X for the tax year ending December 31, 2005, on behalf of the Bank and its subsidiaries, again claiming ownership of the Tax Refund.

The Plan rejected all executory contracts not specifically assumed as of September 16, 2008, the date of the entry of the Order confirming the Plan. The Debtor did not file a motion to assume the Tax Sharing Agreement prior to that date.

**The Adversary Proceeding**

On October 23, 2008, Plaintiff filed his Complaint Under Sections 541 and 542 of the Bankruptcy Code Seeking a Declaratory Judgment Regarding Ownership of a Certain Tax Refund and Turnover of Property of the Bankruptcy Estate [Adv. Pro. Docket No. 1] (the "Complaint"), thereby initiating the instant adversary proceeding against Defendant and the United States of America, acting through the IRS.

In Count I of the Complaint, Plaintiff seeks a declaratory judgment that the Tax Refund is property of the Debtor's bankruptcy estate pursuant to section 541(a) of the Bankruptcy Code. In Count II of the Complaint, Plaintiff requests that the Court require the IRS (to the extent it has not remitted the Tax Refund to the Debtor or Defendant) and Defendant to turn over the Tax Refund to Plaintiff for the benefit of the Debtor's bankruptcy estate in accordance with section 542(a) of the Bankruptcy Code.

On December 11, 2008, Defendant filed an Answer, Affirmative Defenses, and a Counterclaim to the Complaint [Adv. Pro. Docket No. 15]. Defendant asserts that the Tax Refund is property of Defendant's receivership that should be turned over to

---

Consolidated Group generated a net operating loss of $7,324,532 for the 2006 tax year.

Defendant.  Defendant also asserts the following two affirmative defenses: the Tax

Sharing Agreement is null and void as a result of the February 2008 Notice; and because

the Debtor did not specifically assume the Tax Sharing Agreement, the Debtor rejected it,

and as a result, the Tax Sharing Agreement is null and void.  Defendant's Counterclaim

seeks a declaratory judgment that the Bank is the owner of the Tax Refund and that

Defendant, in its capacity as receiver for the bank, is entitled to the Tax Refund.

On January 14, 2009, the IRS filed its Motion to Dismiss [Adv. Pro. Docket No.

24] and memorandum in support thereof [Adv. Pro. Docket No. 25].  As a result of

discussions between the parties, on February 19, 2009, the Court entered a Consent Order

Granting the United States of America's Motion to Dismiss [Adv. Pro. Docket 35] (the

"Consent Order"), which dismissed the IRS from the instant adversary proceeding and

required the IRS to remit the Tax Refund to Defendant to be held in escrow.[6]

By check dated March 6, 2009, the IRS remitted the total amount of

$6,213,576.86, to Defendant.[7]  Defendant placed the amount received from the IRS in an

interest-bearing escrow account in accordance with the terms of the Consent Order and a

supplemental consent order entered on March 13, 2009 [Adv. Pro. Docket No. 40].

On September 21, 2009, as a result of a pre-trial conference held on September

14, 2009, the Court entered a Scheduling Order [Adv. Pro. Docket No. 44] requiring the

parties to file motions for summary judgment on or before December 14, 2009, to file

---

[6] The Consent Order provides that neither the payment by the IRS to Defendant, nor the deposit of the Tax Refund by Defendant into escrow, would have any effect on the determination of the ultimate ownership of the Tax Refund.

7

responses in opposition to the motions for summary judgment within thirty days

thereafter, and to file replies to the responses within twenty days thereafter.  As the Court

noted each party filed a motion for summary judgment, an opposition to the other party's

motion for summary judgment, and a reply to the opposition.

### Summary Judgment Standard

The standard for summary judgment is set forth in Rule 56 of the Federal Rules of

Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the

Federal Rules of Bankruptcy Procedure.  Summary judgment is proper if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with any

affidavits show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); Hyman v. Nationwide

Mut. Fire Ins. Co., 304 F.3d 1179 (11th Cir. 2002).

The evidence and all factual inferences therefrom must be viewed in the light

most favorable to the party opposing the motion, and all reasonable doubts about the facts

must be resolved in favor of the non-moving party.  Andreini & Co. v. Pony Exp.

Delivery Servs., Inc. (In re Pony Exp. Delivery Servs., Inc.), 440 F.3d 1296, 1300 (11th

Cir. 2006); see also Loren v. Sasser, 309 F.3d 1296, 1301-02 (11th Cir. 2002); Hyman v.

Nationwide Mut. Fire Ins. Co., 304 F.3d 1179 (11th Cir. 2002) (citing Burton v. City of

---

[7] The difference between the amount of the requested Tax Refund and the amount tendered by the IRS is apparently attributable to the interest earned on the Tax Refund, which the IRS was required to pay for retaining the Tax Refund.

Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)).  However, "[w]hen a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but . . . must show that there are specific facts demonstrating that there is a genuine issue for trial." Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990).

Moreover, the Court may consider evidence only if the evidence can be "reduced to admissible evidence at trial" or "reduced to admissible form." Macuba v. DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999). See also Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999); McMillian v. Johnson, 88 F.3d 1573, 1584-85 (11th Cir. 1996), aff'd sub nom, McMillian v. Monroe Co., 520 U.S. 781 (1997); Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996).  Plaintiff and Defendant both assert that there is no genuine issue of material fact for trial and that each is entitled to judgment as a matter of law on Counts I and II of the Complaint.  Defendant also asserts that it is entitled to summary judgment on the Counterclaim.

### Count I of the Complaint-The Tax Refund Is Property of the Debtor's Bankruptcy Estate

Under section 541(a) of the Bankruptcy Code, the Debtor's bankruptcy estate is comprised of all legal or equitable interests of the Debtor in property.  Section 541(a)(1) of the Bankruptcy Code states:

> The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:
> (1)  Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1). Accordingly, the filing of the Debtor's Chapter 11 petition commenced the underlying bankruptcy case and created, as of September 28, 2007, the Debtor's bankruptcy estate, which is comprised of all legal and equitable interests of the Debtor in property as of the Petition Date. Thus, the nature of the Debtor's interest in the Tax Refund as of the Petition Date determines whether the right to the refund constitutes property of the Debtor's estate.

Plaintiff makes the following arguments as to why the Tax Refund is property of the estate: 1) Because the members of the Consolidated Group entered into the Tax Sharing Agreement and the agreement is not the product of overreaching or breach of fiduciary duty, the Tax Sharing Agreement governs the relative rights of the members with respect to the Tax Refund and determines whether the right to the refund and the refund itself constitute property of the estate; 2) Under the Tax Sharing Agreement the relationship between the Debtor and the Bank with respect to the Tax Refund is a debtor-creditor relationship, the Bank has no beneficial interest in the Tax Refund, and the Tax Refund is property of the estate; 3) the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure issued by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the OTS effective November 23, 1998 (the "Policy Statement") does not affect the status of the Tax Refund as property of the Debtor's estate; 4) The FDIC's actions in attempting to obtain possession and control of the Tax Refund and purporting to disaffirm the Tax Sharing Agreement violated the automatic stay under section 362(a) of the Bankruptcy Code; 5) the February, 2008 Notice did not affect the status of the Tax Refund as

property of the Debtor's estate; and 6) the Tax Refund is property of the Debtor's estate whether or not the Tax Sharing Agreement was rejected under the Plan.

Defendant makes the following arguments as to why the Tax Refund is not property of the estate: 1) the Debtor paid taxes and received refunds as Agent-Trustee for members of the Consolidated Group; 2) the language of the Tax Sharing Agreement does not create a debtor-creditor relationship between the Bank and the Debtor and thus the Defendant owns the Tax Refund; 3) the Policy Statement and 12 U.S.C. § 371c prohibit a debtor-creditor relationship between banks and their holding companies; 4) Defendant did not violate the automatic stay in filing amended tax returns with the IRS and repudiating and withdrawing from the Tax Sharing Agreement; 5) the Tax Sharing Agreement is unenforceable as a result of Defendant's repudiation and withdrawal and the Debtor's rejection of the Tax Sharing Agreement; 6) the economic reality of the transaction demonstrates no conversion from agent-trustee to debtor-creditor was intended; and 7) the agreement is unenforceable because it is contrary to public policy and is inherently unfair and overreaching.

### Because the members of the Consolidated Group entered into the Tax Sharing Agreement and the agreement is not the product of overreaching or breach of fiduciary duty[8], the Tax Sharing Agreement governs the relative rights of the members with respect to the Tax Refund and determines whether the right to the refund and the refund itself constitute property of the estate

Plaintiff argues that because the members of the Consolidated Group entered into the Tax Sharing Agreement and the agreement is not the product of overreaching or

---

[8] The Court will later discuss Defendant's argument that the Tax Sharing Agreement was unfair and the product of overreaching. Defendant does not appear to argue that the Tax Sharing Agreement was a breach of fiduciary duty and the Court makes no independent finding to that effect.

11

breach of fiduciary duty, the Tax Sharing Agreement governs the relative rights of the members with respect to the Tax Refund and determines whether the right to the refund and the refund itself constitute property of the estate.  Defendant asserts that a bank holding company receives all refunds as an agent for the members of the consolidated group under Treasury Regulation § 1.1502-77 and that nothing in the Tax Sharing Agreement "purports to change this".  Defendant asserts that the Tax Sharing Agreement "allocates" the Tax Refund to the Bank, that nothing in the Tax Sharing Agreement goes on to either "assign or lend" the Tax Refund from the Bank to Debtor, and therefore there "can be no dispute" that Debtor would be acting as an agent in receiving a refund on behalf of the Bank.

Pursuant to 26 C.F.R. § 1.1502-77(a) (2009), subject to exceptions not relevant to this case, "the common parent (or a substitute agent described in paragraph (a)(1)(ii) of this section) for a consolidated return year is the sole agent (agent for the group) that is authorized to act in its own name with respect to all matters relating to the tax liability for that consolidated return year, for--(A) Each member in the group . . . ." 26 C.F.R. § 1.1502-77(a) (2009).  However, while pursuant to § 1.1502-77 a parent company acts as an agent for the consolidated group in filing consolidated tax returns, the designation in § 1.1502-77 of the common parent of a consolidated group as agent for each member of the group is solely for the convenience and protection of the Internal Revenue Service and is not intended to affect the determination of the entity to which a tax refund belongs. Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004)(noting that the

agency provided for under 26 C.F.R. § 1.1502-77(a) "is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S."); Jump v. Manchester Life & Cas. Mgmt. Corp., 579 F.2d 449, 452 (8th Cir. 1978) (noting that the agency relationship set forth in § 1.1502-77 is for the convenience and protection of the IRS only and does not extend further).  Thus, the designation of the Debtor as agent for the other members of the Consolidated Group under 26 C.F.R. § 1.1502-77 does not create a relationship of agent/trustee-principal/beneficiary between the Debtor and the Bank.

Nothing in the Internal Revenue Code or regulations promulgated thereunder purports to determine the relative rights of members of a consolidated group of companies with respect to tax refunds.  Indeed, the Internal Revenue Code is silent as to whether a tax refund must or should inure to the benefit of the common parent, or the benefit of the company which has sustained the loss that makes the tax refund possible. First Cent. Fin. Corp., 269 B.R. at 489; Capital Bancshares, Inc. v. FDIC, 957 F.2d 203, 206 (5th Cir. 1992); Manchester Life, 579 F.2d at 452 (8th Cir. 1978)(the entity ultimately entitled to the benefit of a consolidated tax refund is not addressed in the Internal Revenue Code); W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262, 265 (9th Cir. 1973) ("The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue.")

The question of the relative rights of the members of a consolidated group with respect to a tax refund not having been addressed in the IRC or the regulations

13

thereunder, the members of such a group may allocate such rights under an agreement, in which case, the agreement will control. First Cent. Fin. Corp., 269 B.R. at 490 ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement. **The agreement will control the members' rights** in the absence of overreaching or breach of fiduciary duty.") (citations omitted) (emphasis added). Accord Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.), 159 B.R. 9, 29 (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995). No provision of Georgia corporation law prohibits the members of a consolidated group from freely allocating their ultimate tax liability by express agreement.

Defendant relies heavily on the case of Bob Richards. In that case the parent and subsidiary had not entered into any agreement as to the disposition of a tax refund which resulted solely from the losses of the subsidiary. 473 F.2d at 265. The court held that absent a differing agreement (either explicit or implicit), a tax refund resulting solely from the earnings history of one member of a consolidated group should inure to the benefit of that member. Id. The court stated that permitting the parent company to keep the refund in the absence of a differing agreement simply because the parties entered into a procedural device to facilitate their income tax reporting would unjustly enrich the parent. Id. Since the parties in the instant proceeding did in fact enter into a differing agreement, what would happen in the absence thereof is not relevant to this proceeding. First Cent. Fin. Corp., 269 B.R. at 490; In re Team Financials, Inc., 2010 WL 1730681 * 8 (Bankr. D. Kan. April 27, 2010).

14

**<u>Under the Tax Sharing Agreement, the relationship between the Debtor and the Bank with respect to a tax refund attributable to taxes paid and losses incurred by the Bank is a debtor-creditor relationship, and the Bank has no beneficial interest in a refund due from the IRS.</u>**

Plaintiff asserts that the Tax Sharing Agreement in the instant proceeding is similar to the tax allocation agreement in <u>First Central</u>, 269 B.R. 481. There, the parent ("FCFC") and the subsidiary ("FCIC") had entered into a tax allocation agreement which prescribed how tax payments and refunds were to be apportioned between the two entities. <u>Id.</u> at 211. In 1994 and 1995, FCIC was the only member of the consolidated group to earn taxable income, and, as a result, paid the group's entire tax liability for those years. <u>Id.</u> In 1996 and 1997, the group as a whole and FCIC, on a stand alone basis, suffered losses, which led to FCFC applying for and receiving tax refunds from the IRS, the amounts of which it paid to FCIC pursuant to the tax allocation agreement. <u>Id.</u>

In January 1998, FCIC became insolvent and was placed into receivership. In March 1998, FCFC filed a voluntary petition under Chapter 7 of the Bankruptcy Code. <u>Id.</u> Subsequently, the trustee for FCFC applied to the IRS for a refund of the remaining taxes paid in 1994 and 1995 based upon the carryback of net operating losses for 1997. <u>Id.</u> The trustee claimed the $2.5 million refund as property of FCFC's bankruptcy estate. <u>Id.</u> As the Liquidator of FCIC, the Superintendent of Insurance challenged the trustee's claim to the refund, contending that FCIC owned the beneficial interest in the refund.

The bankruptcy court framed the issue as whether, under the tax allocation agreement, "FCFC holds the Tax Refund as trustee for FCIC, or otherwise holds only bare legal title to the Tax Refund, such that the beneficial interest in the Tax Refund is

15

not property of the estate." Id. at 490.[9] In answering the question in the negative, the court found the following factors to be significant: (1) under the terms of the tax allocation agreement, FCIC would only be entitled to a refund in an amount that it would have received from the IRS had it filed its taxes on a stand-alone basis. Id. at 495; (2) the tax allocation agreement did not provide that "[the parent corporation] holds any portion of the Tax Refund in trust for [the subsidiary] or contain any language even purporting to create such a trust." Id. at 496; (3) the tax allocation agreement contained no provision requiring tax refunds received by the parent corporation to be placed in escrow, no requirement that the parent corporation segregate any tax refund payment due to the subsidiary, and no restrictions on how the refund monies might be used or invested. Id.; (4) the tax allocation agreement simply required, in connection with a tax refund, that a settlement payment be made to FCIC within thirty days of receipt of the money. Id.; and (5) the tax allocation agreement did not contain any language creating an agency relationship because "FCFC does not act at FCIC's direction and control, either in applying for a tax refund, or in the handling of the refund monies once received." Id. at 497.

In rejecting the position espoused by the Superintendent, the court concluded that the parent corporation's obligations to make payments to the subsidiary under the tax allocation agreement in respect of tax refunds created a debtor-creditor relationship with ordinary contractual obligations between the parties, and not a fiduciary relationship. Id.

---

[9] The Superintendent of Insurance for the State of New York only appealed the bankruptcy court's decision not to impose a constructive trust on the refund in favor of the Superintendent. In re First Cent. Fin. Corp., 377 F.3d at 212, n.1.

at 497-98 ("[A]ny payment due to FCIC under the Tax Allocation Agreement will be made by FCFC. This provision is consistent with a debtor-creditor relationship, as are the preceding and following sentences, which both provide for 'settlements' between the parties under the Agreement.").

Finally, with respect to the Superintendent's argument that a constructive trust should be imposed on the tax refund to prevent unjust enrichment, the bankruptcy court observed:

> In the absence of a tax allocation agreement, the Superintendent might be correct that retention of the tax refund would unjustly enrich the bankruptcy estate of FCFC. However, FCFC and FCIC did enter into the Tax Allocation Agreement, which governs their respective rights and responsibilities. No allegation is made by the Superintendent that FCFC acted unfairly, overreachingly, or unconscionably in the creation or implementation of the Tax Allocation Agreement.

Id. at 500-01 (internal citations omitted) ("Thus, in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the Tax Allocation Agreement, the Agreement will be given effect, and there is no basis for imposing a constructive trust on the Tax Refund.").

The Tax Sharing Agreement, like the tax allocation agreement in First Central, does not provide that the Debtor holds any portion of the Tax Refund in trust for the Bank or contain any language purporting to create such a trust. The Tax Sharing Agreement, like the tax allocation agreement in First Central, requires the payment of the refund within thirty days of receipt. The Tax Sharing Agreement, like the tax allocation agreement in First Central, does not contain a provision requiring that tax refunds received by it be placed in escrow, does not require that the Debtor segregate any tax

refund due to the Bank and places no restrictions on how the money might be used. Finally, the Tax Sharing Agreement, like the tax allocation agreement in <u>First Central</u>, does not contain any language creating a true agency relationship because the Debtor does not act at the Bank's direction and control, either in applying for a tax refund, or in the handling of the refund monies once received.

Initially Defendant argues that <u>First Central</u> is not applicable and should not be followed. Defendant argues that the court in <u>First Central</u> failed to make the "critical, distinction" that the parent is the agent for the group and the parent has no beneficial interest in a tax refund unless an agreement gives it one. However, the court in <u>First Central</u> found that the specific terms of the tax sharing agreement created a debtor-creditor relationship. Alternatively, Defendant argues that the factors relied upon by the. Court in <u>First Central</u> do not show an intent to "supersede the holding company's agency status and create a debtor-creditor relationship." Defendant argues that the 30-day delay in payment is administratively justified and does not imply that the funds are loaned to the parent during the 30-day period. Citing to <u>Penn Central Transportation Company</u>, 486 F.2d 519, 524 (3<sup>d</sup> Cir. 1973)(en banc) cert. denied 415 U.S. 990 (1974), Defendant asserts that the Debtor's ability to commingle the Tax Refund with its own funds is not conclusive as to whether a trust was or was not created. Defendant argues that whether the payment of interest is required is at least as significant as whether commingling and delay in payment are permitted. In the <u>Penn Central</u> case, which was decided before the enactment of the Bankruptcy Code, the Third Circuit held that amounts collected from shippers and passengers by origination or destination railway carriers for interline railway

carriers that also performed carriage services for these customers in connection with a shipment or trip were held in trust by the collecting carrier and did not become property of the bankruptcy estate of the collecting carrier. Id. at 527. The court found that the absence of a provision for the payment of interest was not conclusive but indicated the presence of a trust relationship. Id. at 524. The court also found that "while generally commingling indicates a debtor-creditor relationship and not a trust, it is only one indicium and it too is not necessarily conclusive." Id.

While the Court recognizes that the payment of interest is a factor in determining whether a trust was created, the Court places more significance on the absence in the Tax Sharing Agreement of a provision requiring that the Debtor place tax refunds received by it in escrow, the absence of a provision requiring that the Debtor segregate any tax refund due to the Bank, and the absence of restrictions on how the money might be used during the time between the receipt of a refund and the payment to a member. In Pan American World Airways, Inc. v. Shulman Transport Enter., Inc. (In re Shulman Transport Enter., Inc.), 744 F.2d 293, 295 (2d Cir. 1984) the court rejected an air carrier's argument that collections on a freight forwarder's accounts receivable arising from transportation services provided by the carriers were the carriers' property. In that case, the debtor was an international freight forwarder. As a part of its business, the debtor received freight from shippers and arranged, under the shippers' respective names, for transportation of the freight by various air carriers, all of whom were members of a trade association, the IATA. The debtor collected the amounts charged the shippers for their shipments and

received a commission out of the carrier rate so charged.  Id. at 294.  The debtor remitted to the air carriers on a monthly basis.  Id. at 295.

The debtor and the IATA were parties to a "Cargo Agency Agreement" pursuant to which the debtor arranged for the transportation of freight by the air carriers with whom it did business.  Id.  The Cargo Agency Agreement described the debtor as the agent of the carriers.  Id.  It provided that all monies collected from the shippers by the debtor for transportation sold under the agreement constituted the property of the respective carriers.  Id. at 296.  The Cargo Agency Agreement further provided, however, that the debtor would be responsible for monies due the carriers for their services whether or not the monies were collected from the shippers.  Id.

After the debtor filed for relief under chapter 11, it sought court approval of a post-petition financing facility with its pre-petition lender under which the post-petition advances would be secured by a security interest in, among other things, the debtor's accounts receivable.  Id. at 294.  In response, one of the carriers, Pan Am, on its own behalf and on behalf of other members of IATA who did business with the debtor under the Cargo Agency Agreement, objected, arguing that collections on the debtor's accounts receivable arising from the transportation services provided by the carriers were the carriers' property under the terms of the Cargo Agency Agreement and that, therefore, such accounts receivable could not be included in the security interests granted to the lender.  Id. at 294.

The district court rejected Pan Am's contention that the accounts receivable and collections thereon belonged to the carriers and were not property of the debtor.  The

court of appeals affirmed. In affirming the decision below, the court of appeals found

that the substance of a transaction determines whether a true agency relationship has been

created between parties to a contract whether or not one of the parties to the contract is

described in the contract as an agent of the other. Id. at 295. The court noted that an

essential characteristic of an agency relationship is that the agent acts subject to the

principal's direction and control and that "absent the critical element of control by Pan

Am over Shulman's collection and handling of funds, Shulman cannot be said to have

acted as Pan Am's agent for receipt of transportation charges." Id. The court noted that

there was no provision in the agreement requiring Shulman to segregate from its general

funds monies collected for the carriers' services or restricting the use of those monies and

that Shulman "apparently was free to use the funds for its own benefit rather than that of

the carriers. Although the absence of a segregation provision and even the actual

commingling of funds are not conclusive indications of a [debtor-creditor relationship],

the apparent lack of concern on the part of the carriers about how Shulman handled the

monies it collected indicates that, in this respect at least, Shulman was not subject to the

carriers' direction and control." Id. at 295-296. The Court agrees with the reasoning set

forth in Shulman. Because of the absence of a provision in the tax allocation agreement

in First Central and the Tax Sharing Agreement in the instant proceeding requiring that

the tax refunds be placed in escrow, the absence of a provision requiring that the tax

refunds be segregated, and the absence of any restrictions on how the money might be

used between the date of receipt by the parent and the date of payment to the subsidiary

evidence a lack of direction and control on the part of the parent, they evidence an intent to create a debtor-creditor relationship.

In addition to the similarity between the tax allocation agreement in <u>First Central</u> and the Tax Sharing Agreement in the instant proceeding, Plaintiff points to other provisions in the Tax Sharing Agreement which it alleges establish a debtor creditor relationship between the Debtor and the Bank. Specifically, Plaintiff points to sections 4(e), and 10(a)(iii). Those sections respectively provide:

> If the Bank Affiliated Group incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, **the amount payable to the Bank Affiliated Group by NetBank** shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), **regardless of whether the consolidated group is receiving a refund**.

> Should the Bank Affiliated Group incur a tax loss, it should receive a refund from NetBank in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, **regardless of whether the NetBank consolidated group is receiving a refund**.

Tax Sharing Agreement at p. 6, §4(e) (emphasis added), Tax Sharing Agreement at p. 8, §10(a)(iii) (emphasis added).

Plaintiff argues that pursuant to these sections of the Tax Sharing Agreement, the Bank's right to receive payment from the Debtor in respect of a tax refund is not dependent on receipt by the Debtor of a refund from the IRS or the Debtor even being entitled to receive a refund from the IRS. Rather, regardless of whether the Debtor is entitled to receive a refund from the IRS based on a consolidated return, if the Bank Affiliated Group would have been entitled to a tax benefit if it had filed a separate return,

the Debtor is obligated under the Tax Sharing Agreement to pay the amount of such benefit to the Bank.

Defendant asserts that the language in sections 4(e) and 10(a)(iii) simply ensures that the Bank will receive the same benefits that it would have received if it had filed its own separate tax return and that the Bank's tax refunds should not be used to pay the tax liability of other members of the Consolidated Group. Defendant points out that if the Bank is entitled to a refund, but the Consolidated Group is not, it necessarily means that the other members of the Consolidated Group had taxable income and would be obligated to make tax payments to the Debtor. Defendant contends that the Tax Sharing Agreement provides that the Debtor, as agent, is to take the amounts received from the other members as their separate tax liability, and pay it to the Bank. Defendant argues that this right reinforces the existence of the agency relationship because it assures the Bank that it will receive exactly what it would have received if it had not joined in the filing of the consolidated return.

There is no language in the Tax Sharing Agreement which provides that the Debtor as agent is to take the amount received from other members of the Consolidated Group as their separate tax liability and pay it to the Bank. Just as the Debtor is obligated under the Tax Sharing Agreement to pay the Bank, regardless of whether the Consolidated Group is receiving a refund, the Debtor's obligation to pay the Bank is nowhere conditioned on the Debtor's collection of tax payments from other members of the Consolidated Group. Under the Tax Sharing Agreement, members of the Consolidated Group other than the Debtor have no obligation to the

Bank with respect to the tax attributes of the Bank Affiliated Group. In receiving tax payments from members of the Consolidated Group, the Debtor is not serving as a collection agent for the Bank because the other members of the Consolidated Group have no obligation to the Bank under the Tax Sharing Agreement. There is no support in the Tax Sharing Agreement for the position that, if the Bank Affiliated Group has tax losses that would have entitled it to a refund if it had filed separately, members of the Consolidated Group other than the Debtor who have taxable income that is sheltered by the tax losses are obligated to the Bank with respect to such losses.

Furthermore, there is no assurance that a member of the Consolidated Group that had taxable income in a year in which the Bank Affiliated Group had losses would have the liquidity to pay its share of taxes to the Debtor. Yet, such an inability to pay the Debtor in no way would alleviate the Debtor's obligation under the Tax Sharing Agreement to pay the Bank an amount equal to the amount the Bank Affiliated Group would have received as a separate entity. Finally, the fact that tax payments from other members of the Consolidated Group might provide a source or partial source of the funds used by the Debtor to pay its obligations to the Bank under the Tax Sharing Agreement in no way changes the fact that a debtor-creditor relationship was established between the Debtor and the Bank under the agreement regarding amounts equal to the amounts to which the Bank Affiliated Group would have been entitled if it had filed separately. The Debtor, and only the Debtor, is the obligor to the Bank under the agreement, and the source of funds it might use to fulfill its obligations to the Bank would not alter the nature of the relationship. The Court finds that the language in §§ 4(e) and 10(a)(iii) of the Tax

24

Sharing Agreement establish a debtor-creditor relationship between the Debtor and the Bank.

### Section 9(c) of the Tax Sharing Agreement

Finally, Plaintiff argues that section 9(c) of the Tax Sharing Agreement which provides that "[i]n its sole discretion [the Debtor] shall have the right with respect to any Consolidated Returns which it has filed or will file: to file, prosecute, compromise or settle any claim which the Netbank Affiliated Group may be entitled shall be paid by the way of refund or credited against the tax liability of the Netbank Group" evidences a debtor-creditor relationship. Plaintiff argues that that section affords Debtor complete discretion to determine whether to seek a refund from the IRS or have applied as a credit against the tax liability of the Consolidated Group, the amount to which the Debtor is entitled in respect of such tax attributes. Plaintiff argues that such discretion is completely inconsistent with the notion that Debtor held the right to refunds in trust for the benefit of the Bank or any other member of the Consolidated Group.

Defendant points out that section 9 is entitled procedural matters and simply appoints the Debtor as "agent and attorney-in-fact" to undertake the procedural requirements of preparing and filing the Consolidated Group's tax return. Defendant acknowledges that the Debtor is permitted to determine the manner in which the deficiency is assessed by the IRS and to prosecute and settle any claim the Consolidated Group may have against the IRS but asserts that none of these provisions bestows ownership of any Tax Refunds received by the Consolidated Group on the Debtor. The

Court agrees with Defendant on this point. Section 9(c) refers specifically to procedural matters and does not establish a debtor-creditor relationship.

At a minimum, Plaintiff argues that the language in section 9(c) that each member of the Consolidated Group irrevocably appoints the Debtor as its "agent and attorney-in-fact" does not create a true principal-agent relationship between the Debtor and the Bank such that the Debtor's interest in the Tax Refund is limited to bare legal title held for the benefit of the Bank. As the Court previously noted, the substance of a transaction determines whether a true agency relationship has been created between parties to a contract whether or not one of the parties to the contract is described in the contract as an agent of the other. Shulman Transport, 744 F.2d at 295. An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control. Id. The Court finds that the language in 9(c) does not subject the Debtor to the direction or control of any member of the Consolidated Group and does not establish a principal-agent relationship between the members of the Consolidated Group and the Debtor.

### The Economic Reality of the Tax Sharing Agreement is the Establishment of a debtor-creditor relationship betweent the Debtor and the Bank with respect to the Tax Refund

Defendant urges the Court to adopt the reasoning set forth in BSD Bancorp, Inc. v. FDIC, Case No. 93-12207-A11 (S.D. Cal. 1995), an unpublished opinion which Defendant attached to its motion for summary judgment, for the notion that the mere existence of a tax sharing agreement does not supersede a holding company's obligation as an agent trustee for members of the consolidated group. In that case the parties had entered into a tax sharing agreement. The court found that is was necessary to determine

whether the terms of the tax allocation agreement expressly or impliedly overrode the Bob Richards principal-agent relationship. The court found that in determining whether a transaction was intended to create a debtor-creditor relationship, a court must examine the economic reality of the transaction instead of the words used. The court found that the agreement's requirement that the holding company give the bank its share of the refund in cash and immediately except in the "unusual" circumstance in which the agreement allowed the holding company to borrow the refund suggested an intent to maintain a principal agent relationship unless the holding company borrowed the refund. The court found that pursuant to the tax allocation agreement the holding company did not have the right to borrow the funds at issue because it had the ability to pay the refund immediately to the subsidiary.

Defendant asserts that the economic reality of the transaction in this proceeding is consistent with an agent-trustee relationship. Initially the Court notes that Plaintiff does not take the position that the mere existence of the Tax Sharing Agreement converts the status in which the Debtor receives refunds from that of an agent trustee to an owner debtor. Plaintiff's position is that, under applicable law, it is permissible for a tax sharing agreement to establish a debtor creditor relationship between a common parent and a subsidiary with respect to tax refunds attributable to the earnings history of the subsidiary and that the economic reality provided for in the Tax Sharing Agreement established a debtor creditor relationship.

The facts in BSD Bancorp are different than those here. There the court found that the tax allocation guidelines in the tax allocation agreement at issue were "extremely

vague." Id. at 8. Moreover, based on the provisions of the agreement described in the opinion, it does not appear that the agreement authorized the parent corporation, in its sole discretion, to decide whether to seek a refund from the IRS or, instead, have the amount of an overpayment applied as a credit against the tax liability of the consolidated group. Finally, there is no indication in the opinion that the tax allocation agreement explicitly required payment by the parent to the subsidiary regardless of whether the consolidated group was receiving a refund. In contrast, the provisions of the Tax Sharing Agreement that establish the debtor-creditor relationship between the Debtor and the Bank are not vague. In view of these provisions, the economic reality under the Tax Sharing Agreement is that the Debtor has the power to decide whether even to seek a refund or, instead, to have an overpayment applied as a credit to the tax liability of the Consolidated Group. Whether or not the Debtor seeks a refund, and whether or not the Debtor receives a refund, it is obligated to pay the Bank an amount equal to the amount the Bank would have received if the Bank Affiliated Group had filed a separate return. The economic reality of this transaction is that the Debtor, not the IRS, is the Bank's obligor and that a debtor-creditor relationship was created between the Debtor and the Bank under the Tax Sharing Agreement with respect to the tax attributes of the Bank Affiliated Group.

Case 08-ap-00346-JAF Doc 64 Filed 09/30/10 Page 29 of 40

**<u>The Interagency Policy Statement does not affect the status of the Tax Refund as property of the Debtor's estate.</u>**

Initially Defendant appears to argue that the Policy Statement prohibits a debtor-creditor relationship between banks and their holding companies. Defendant points to the following "express prohibition" language in the Policy Statement:

> Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

As Plaintiff points out, however, the Policy Statement does not constitute a rule or regulation or have the force of law, but rather was issued "to provide guidance to banking organizations and savings associations regarding the allocation and payment of taxes among a holding company and its subsidiaries", when a holding company and its subsidiaries, including one or more depository institution subsidiaries, filed consolidated group income tax returns. Policy Statement at p. 64758; See In re Seidman, 37 F.3d 911, 931-32 (3d Cir. 1994) (holding that an OTS "Statement of Policy," set forth at 12 C.F.R. § 571.7(b), was not "regulation or law"). In fact, the Policy Statement has even less force than the statement of policy in Seidman, since the Policy Statement, unlike the statement of policy in Seidman, was never set forth in the Code of Federal Regulations. See Krazalick v. Republic Title Co., 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to

earn deference. A simple announcement is all we have here. One fine day the policy statement simply appeared in the Federal Register. No public process preceded it ...."), cert. denied, 539 U.S. 958 (2003); see also Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant Chevron-style deference."); Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n, 869 F.2d 719, 736 (3d Cir. 1989) (concluding that an agency's policy statement "is entitled to no greater deference than any other policy statement, i.e., none"); Vietnam Veterans of Am. v. Sec'y of the Navy, 843 F.2d 528, 537 (D.C. Cir. 1988) ("A binding policy is an oxymoron.").

Alternatively, Defendant argues that the force of the Policy Statement is not the issue. Defendant contends that in light of the above quoted language from the Policy Statement, the language in section 10(a) of the Tax Sharing Agreement that "[the] [Tax Sharing] Agreement is intended to allocate the tax liability in accordance with the [Policy Statement]" undermines Plaintiff's argument that the Tax Sharing Agreement was intended to create a debtor-creditor relationship and evidences the parties' intent that the Debtor was intended to act only as an agent-trustee. However, section 10(a) goes on to state that "[u]nder this guidance, tax settlements between the [Bank] Affiliated Group and the [Consolidated Group] should result in no less favorable treatment to the [Bank] Affiliated Group than if it had filed its income tax return as a separate entity. Accordingly...". The Tax Sharing Agreement then sets forth the following specific instances in which tax settlements should result in no less favorable treatment to the Bank

Affiliated Group than if it had filed its income tax return as a separate entity; 1) tax remittances for current tax expense should not exceed the amount the Bank Affiliated Group would have paid if it had filed separately-10(a)(i); 2) tax payments by the Bank Affiliated Group should not be made before the Bank Affiliated Group would have been obligated to pay the taxing authority if it had filed separately-10(a)(ii); 3) if the Bank Affiliated Group incurs a tax loss, it should receive a refund from [the Debtor] in an amount no less than it would have received as a separate entity regardless of whether the [Consolidated Group] is receiving a refund-10(a)(iii); and 4) the Bank Affiliated Group should not pay its deferred tax liabilities or the deferred portion of its applicable income taxes to the Debtor since these are not liabilities required to be paid in the current reporting period-10(a)(iv). The Court finds that the language in section 10(a) of the Tax Sharing Agreement regarding its intent to allocate tax liability in accordance with the Policy Statement refers specifically to those circumstances set forth in 10(a)(i)-(iv) and does not express an intent to create an agent-trustee relationship or otherwise undermine Plaintiff's argument that the Tax Sharing Agreement was intended to create a debtor-creditor relationship.

### 12 U.S.C. § 371c does not affect the status of the Tax Refund as property of the Debtor's estate

Defendant asserts that the Tax Sharing Agreement does not meet the requirements of 12 U.S.C. § 371c. Specifically, Defendant argues that to the extent the Tax Sharing Agreement characterizes all refunds received by the Debtor from the IRS as loans from the members to the Debtor, it is inconsistent with the requirements of § 371c. Generally, that section provides that a bank cannot make a loan to an affiliate in an amount that

exceeds a percentage of the capital stock and surplus of the bank.  Even assuming that the Tax Sharing Agreement triggers the restrictions set forth in § 371c, the Court cannot determine from the record before it that the Tax Sharing Agreement violates these restrictions.

### Defendant's actions in attempting to obtain possession and control of the Tax Refund and purporting to disaffirm the Tax Sharing Agreement violated the automatic stay under section 362(a) of the Bankruptcy Code.

Next, Defendant argues that the Tax Sharing Agreement is unenforceable because Defendant repudiated the Tax Sharing Agreement pursuant to its authority under 12 U.S.C. § 1821(e).[10]  However, because the Tax Refund became property of the Debtor's bankruptcy estate upon the filing of Debtor's bankruptcy petition, Defendant's actions in seeking to have the Tax Refund paid to it, including its purported disaffirmance of the Tax Sharing Agreement, violated the automatic stay and are void and ineffective.  Under sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code, the filing of a bankruptcy petition operates as a stay of:

> (3)  any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

---

[10] 12 U.S.C. § 1821(e) provides:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease –
>> (A) to which such institution is a party;
>> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

· · ·

(6)     any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. §§ 362(a)(3) and (a)(6).

Under the terms of the Tax Sharing Agreement, on the Petition Date the Debtor had the right to obtain possession and control of the Tax Refund (which right the Debtor asserted on September 4, 2007, by filing a Form 1139 seeking the Tax Refund, and again on or about June 11, 2008, by filing a Form 1120X). Accordingly, the Debtor had a legal and equitable interest in the Tax Refund on the Petition Date. Therefore, the Tax Refund constitutes property of the Debtor's bankruptcy estate. The filing by Defendant of its Form 1139 on November 26, 2007, and its Form 1120X on June 18, 2008 constituted acts to obtain possession of property of the estate and to exercise control over property of the estate, namely, the Tax Refund or the right of the Debtor to receive the Tax Refund and were therefore violations of the automatic stay under § 362(a)(3) of the Bankruptcy Code. Furthermore, because the Bank's rights under the Tax Sharing Agreement with respect to the Tax Refund were limited to a right to be paid a certain amount by the Debtor, the Defendant's actions amount to an effort to collect or recover a claim against the Debtor by end-running the bankruptcy claims process to obtain payment directly from the IRS. Accordingly, the FDIC also violated the provisions of section 362(a)(6) of the Bankruptcy Code.

In addition, the law is clear that contracts to which the Debtor is a party are property of the Debtor's bankruptcy estate. 3 Collier ¶ 362.03[5][a] ("Executory contracts and leases are considered a form of property of the estate."). Therefore,

33

Defendant's February 2008 Notice, in addition to constituting a further attempt to obtain possession of and to exercise control over the Tax Refund and the Debtor's right to receive the Tax Refund, constituted an act to exercise control over the Tax Sharing Agreement. Accordingly, the February 2008 Notice further violated the automatic stay and section 362(a)(3) of the Bankruptcy Code.

Section 362(b) of the Bankruptcy Code provides various exceptions to the operation of the automatic stay. Defendant argues that it has explicit authority to file tax returns with the Internal Revenue Service on behalf of a bank for which it is appointed receiver pursuant to 26 C.F.R. § 301.6402-7. Defendant asserts that when it filed the necessary returns with the IRS to collect the tax refund, it was carrying out its statutory duty to collect the assets of the insolvent bank in order to distribute them to the Bank's depositors and creditors. Additionally, Defendant asserts that it did not violate the automatic stay when it repudiated and withdrew from the Tax Sharing Agreement pursuant to its authority under 12 U.S.C. § 1821 because it was acting in accordance with its role as receiver of the Bank in repudiating a contract that was burdensome to the Bank. Although Defendant does not specifically state, it appears to argue that its actions are excepted from the automatic stay pursuant to § 362(b)(4) of the Bankruptcy Code. Among other things, that section excepts from the operation of sections 362(a)(1), (2), (3) and (6) of the Bankruptcy Code "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power . . . ." Defendant has taken the position that, under the "separate capacities" doctrine, it is treated as two separate persons when acting as a regulator and

34

when acting as a receiver.  See, e.g., Howell v. FDIC, 986 F.2d 569, 574 (1st Cir. 1993).

To the extent that the FDIC argues that its actions were an enforcement of its regulatory

power under 12 U.S.C. § 1821(e) and IRC Reg. § 301.6402-7, the Court disagrees.

Because Defendant was acting in its capacity as receiver for the Bank, and not in its

corporate capacity as a regulator, when it filed its Form 1139 and Form 1120X, and sent

the February 2008 Notice to the Debtor (all without seeking relief from the automatic

stay), its actions do not fall within the exception set forth in section 362(b)(4).  See

Sunshine Dev., Inc. v. F.D.I.C., 33 F.3d 106, 114 n.8 (1st Cir. 1994)(noting that when

FDIC operates as receiver or conservator, it does not exercise regulatory power within the

meaning of § 362(b)(4)).  Accordingly, the FDIC's efforts to obtain the Tax Refund and

disaffirm the Tax Sharing Agreement violated the automatic stay, were void and of no

effect, and cannot have undermined in any way the estate's claim to the Tax Refund.  See

Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 976 (1st Cir. 1997)

(holding that action taken in violation of the automatic stay is void, not simply voidable).

### The Tax Refund is property of the Debtor's Estate whether or not the Tax Sharing Agreement was rejected under the Plan

Defendant alleges that the Tax Sharing Agreement was rejected by the Debtor

pursuant to the terms of the Plan and the confirmation thereof.  The Plan provides that,

except for insurance policies, all executory contracts and unexpired leases other than

those set forth on Exhibit C to the amended disclosure statement [Docket No. 398] (as

amended, the "Disclosure Statement"), or assumed or rejected prior to the effective date

of the Plan pursuant to a final order of the bankruptcy court, shall be deemed rejected as

of the confirmation date of the Plan (the "Confirmation Date").  See Plan at p. 30, §7.2.

The Tax Sharing Agreement was not included on Exhibit C to the Disclosure Statement, and it was not assumed or rejected otherwise pursuant to a court order.[11]  Thus, to the extent the Tax Sharing Agreement was an executory contract and remained in effect as of the Effective Date, it was rejected as of the Confirmation Date.  However, even if the Tax Sharing Agreement was an executory contract at the time the Plan was confirmed, and was therefore rejected as of the Confirmation Date, rejection of an executory contract is not tantamount to extinguishment, rescission, cancellation or termination and did not affect the bankruptcy estate's ownership of the Tax Refund, which was established before the Petition Date.  Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1307 (11th Cir. 2007) ("The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property."); In re Executive Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) ("Property acquired prior to the filing of a petition in bankruptcy remains property of the estate regardless of whether the trustee or debtor in possession assumes or rejects the unperformed obligations of the contract pursuant to which the property was acquired.").  Because the right to the Tax Refund vested in the Debtor pursuant to the Tax Sharing Agreement before the Petition Date[12], the Tax Refund constitutes property of the Debtor's estate whether or not the Tax Sharing Agreement was rejected pursuant to the Plan.

---

[11] Exhibit C to the Disclosure Statement states "None" and contains no executory contracts or unexpired leases.

[12] The beneficial interest in the Tax Refund vested in the Debtor no later than January 1, 2007, the first day of the Debtor's tax year immediately succeeding the tax year in which the losses giving rise to the Tax Refund were incurred.  See, e.g., Official Committee of Unsecured Creditors v. Citicorp North America, Inc. (In re TOUSA, Inc.), 406 B.R. 421, 432-33 (Bankr. S.D. Fla. 2009) (holding that the debtor's right to a tax refund resulting from the carryback of net operating losses incurred in 2007 to years 2006 and 2005 arose at 12:01 a.m. on January 1, 2008, immediately after the conclusion of year 2007).  The Debtor's

**The Tax Sharing Agreement is not Unfair and was not the Product of Overreaching**

Defendant asserts that to the extent the Tax Sharing Agreement intended to create a debtor-creditor relationship between the Holding Company and the members, it is contrary to the Policy Statement and inconsistent with the requirements of 12 U.S.C. § 371c. The FDIC goes on to argue that to the extent the Tax Sharing Agreement accomplished such a result, it is unfair and overreaching "as determined by the federal regulators charged with the direct supervision of the industry, and contrary to federal statutory requirements" and therefore unenforceable. The Court has already determined that neither the Policy Statement nor 12 U.S.C. § 371c affects the status of the Tax Refund as property of the estate. Accordingly, the Court rejects the ensuing argument that the argument is unfair and overreaching on that basis.

**Count II of the Complaint**

**Pursuant to section 542(a) of the Bankruptcy Code, Defendant is required to turn over the Tax Refund to the Liquidating Supervisor for the benefit of the Debtor's bankruptcy estate.**

As the Court noted, the IRS remitted the Tax Refund to Defendant, who placed the Tax Refund in an interest-bearing escrow account in accordance with the terms of the supplemental consent order entered on March 13, 2009. Section 542(a) of the Bankruptcy Code provides that an entity in possession, custody, or control of property that the debtor may use under section 363 of the Bankruptcy Code, shall turn such property over to the debtor, unless such property is of inconsequential value or benefit to

---

beneficial interest in the Tax Refund thus arose long before Defendant was appointed receiver for the Bank in late September 2007. The Debtor's beneficial interest in the Tax Refund became property of the estate when the Debtor filed its bankruptcy case.

the estate.  See 11 U.S.C. § 542(a).

The Tax Refund constitutes valuable, beneficial property of the Debtor's estate that Plaintiff may use in accordance with the Plan and section 363 of the Bankruptcy Code.  No exception to the requirement under section 542(a) of the Bankruptcy Code that such property be turned over to the estate is applicable in this case.  Therefore, Plaintiff has established that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law on Count II of the Complaint.  Accordingly, pursuant to section 542(a) of the Bankruptcy Code, Defendant shall turn over the Tax Refund to Plaintiff for the benefit of the Debtor's estate.

### Counterclaim

Having found that the Tax Refund is property of Debtor's bankruptcy estate, Defendant's Counterclaim which seeks a declaratory judgment that the Bank is the owner of the Tax Refund and that Defendant, in its capacity as receiver for the bank, is entitled to the Tax Refund, is due to be denied.

### Conclusion

The members of the Consolidated Group entered into the Tax Sharing Agreement to allocate their respective rights and obligations with respect to the reporting and payment of taxes and to establish the relationships among themselves with respect to tax attributes such as net operating losses.  Under the Tax Sharing Agreement, the Debtor did not function as a collection agent under the direction and control of any other member of the Consolidated Group, including the Bank, with respect to tax refunds.  The Debtor had discretion to determine whether a refund would be sought in the case of an overpayment

or whether the overpayment would be credited against future tax liability. By the same token, however, the Debtor had an obligation under the Tax Sharing Agreement to pay the Bank the amount of any benefits to which the Bank Affiliated Group would have been entitled based on their tax attributes if the Bank Affiliated Group had filed separate tax returns. This obligation was not conditioned upon receipt by the Debtor of a refund from the IRS but instead was an independent contractual commitment. The Debtor had an obligation to pay regardless of whether a refund was forthcoming from the IRS, and this contractual arrangement resulted in the creation of a debtor-creditor relationship between the Debtor and the Bank.

Under the Tax Sharing Agreement, the Debtor was not required to segregate tax refunds from its other assets or otherwise hold the refunds in trust for other members of the Consolidated Group. Based on these facts and the debtor-creditor relationship between the Debtor and the Bank created under the Tax Sharing Agreement regarding the tax attributes of the Bank Affiliated Group, the rights to tax refunds from the IRS belonged to the Debtor. The right to the refund in respect of the 2005 overpayment belonged to the Debtor on the Petition Date and became property of the estate on that date.

Defendant's efforts to repudiate or disaffirm the Tax Refund violated the automatic stay and are null and void. Even though the Tax Sharing Agreement was deemed to have been rejected under the Plan, rejection is not the equivalent of rescission and did not impair the Debtor's rights in property acquired in accordance with the terms

of the Tax Sharing Agreement before rejection occurred. The Court will enter a separate

judgment in accordance with this Order.

**DATED** this 30 day of September, 2010 in Jacksonville, Florida.

_____
JERRY A. FUNK
United States Bankruptcy Judge

**Copies to:**

Todd C. Meyers, Attorney for Plaintiff
Adina Pollan, Attorney for Defendant