# Exhibit B

FEB 28 1995

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>BSD BANCORP, INC.,<br><br>    Debtor. | Case Number 93-12207-A11<br><br>DIST. CT. CASE NO.<br>94-1341-IEG |
| BSD BANCORP, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION, as Receiver for<br>the Bank of San Diego,<br><br>    Defendant. | ORDER DENYING PLAINTIFF'S<br>MOTION FOR SUMMARY JUDGMENT<br>AND ORDERING FURTHER<br>BRIEFING ON DEFENDANT'S<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT<br>[DOC. # 2] |
| FEDERAL DEPOSIT INSURANCE<br>CORPORATION, as Receiver for<br>the Bank of San Diego,<br><br>    Counterclaimant,<br><br>v.<br><br>BSD BANCORP, INC.,<br><br>    Counterdefendant. | |

1

## BACKGROUND

BSD Bancorp Inc. ("Bancorp") was the corporate parent of the Bank of San Diego ("Bank"). On October 29, 1993, the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for the Bank. On November 3, 1993, Bancorp filed a petition under Chapter 11 of the Bankruptcy Code.

Bancorp and the corporations which it controlled, including the Bank, filed their tax returns as a consolidated group. When a group of affiliated corporations elects to file their tax returns as a consolidated group, the entire group is subject to one annual tax liability. Losses in one company can be offset against profits in another for purposes of computing this tax liability, and many intercompany transfers have no direct effect on tax liability. The group's parent corporation files the return, pays the tax, receives any refunds, and deals with the IRS generally. The corporations in the group are each severally liable for the entire amount of the tax. *See generally* Boris I. Bittker & James S. Eustice, *Federal Taxation of Corporations and Shareholders* ¶ 13.43 (6th ed. 1994).

Shortly after its bankruptcy filing, Bancorp received federal and state tax refunds totalling about $2 million. Those refunds are said to be Bancorp's primary asset. The refunds were concededly based on prior tax payments attributable to the Bank's earnings, and have been kept in a segregated account. The FDIC

///
///
///
///

2

filed a contingent claim against Bancorp in the bankruptcy court,[1] contending that Bancorp held the tax refunds in trust for the Bank and that they were thus not property of the bankruptcy estate.

On March 24, 1994, Bancorp initiated an adversary proceeding in the bankruptcy court against the FDIC as receiver of the Bank, seeking a declaration that the tax refunds are property of the estate and the avoidance of a number of prepetition payments which Bancorp made to the Bank. This Court withdrew the reference on August 8, 1994. Bancorp has now filed a motion for summary judgment on its first declaratory judgment claim. The FDIC has filed a cross-motion for partial summary judgment.

DISCUSSION

A.  Debt or Trust?

There is no dispute that Bancorp owes all or most of the refund money to the Bank. The primary issue here is whether this is an ordinary debt or a sum of money which Bancorp holds in trust for the Bank. If the debt is an ordinary debt, the FDIC has to share the refund money with Bancorp's other creditors in bankruptcy. If the money is held in trust, on the other hand,

///

---

[1]The FDIC also tried to get the IRS to pay the federal refunds directly to it by following the procedure set out in Treas. Reg. § 301.6402-7. That rule establishes a special procedure by which the FDIC and other receivers for insolvent financial institutions can arrange to receive the institutions' share of refunds owed to consolidated groups directly. Bancorp contends that by invoking this procedure, the FDIC violated the automatic stay. At any rate, the FDIC was unsuccessful; the IRS paid the refunds to Bancorp.

1  under 11 U.S.C. § 541(d) it is not part of the bankruptcy
2  estate,[2] and Bancorp has to hand it over to the FDIC.
3      *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262,
4  265 (9th Cir. 1973), held that the parent of a consolidated group
5  acts as an agent for the rest of the group in collecting taxes
6  and refunds. The court based this holding on Treas. Reg. §
7  1.1502-77, which provides that the parent corporation is an agent
8  of the remaining corporations for a number of purposes set out in
9  detail in the regulation. This holding is thus apparently
10 federal common law.
11     Furthermore, because of the agency relationship, the parent
12 corporation holds the money owing to the subsidiaries in trust
13 for them. 473 F.2d at 265. This accords with the general
14 principle that when an agent "is vested with the title to
15 property that he holds for his principal, he is also a trustee."
16 1 Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 8,
17 at 95 (4th ed. 1987).[3]
18     The rules of *Bob Richards* would seem to resolve the issue
19 and lead to the conclusion that Bancorp holds the refunds in
20 trust. Bancorp argues, however, that because it entered into a

---

[2]Ninth Circuit cases applying 11 U.S.C. § 541(d) have said that assets held in trust might nonetheless be property of the bankruptcy estate if the state law creating the trust was contrary to federal bankruptcy policy. See, e.g., *In re Unicom*, 13 F.3d 321, 325 & n.6 (9th Cir. 1994). No case has yet considered whether this "policy override" would apply to a trust arising under federal law.

[3]The Third Circuit recently declared a similar federal common law trust over certain refunds that a bankrupt gas pipeline held for its customers pursuant to an order of the Federal Energy Regulatory Commission. *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1055-61 (3d Cir. 1993).

4

tax sharing agreement with the Bank, their relationship was transformed in such a way that it holds the money as a debtor and not in trust. The FDIC attacks this tax allocation agreement on a number of grounds.

### B. The Tax Allocation Agreement

Bancorp, the Bank, and other affiliated corporations entered into a tax sharing agreement in 1991. (Pl.'s Ex. 17.) Their boards of directors ratified it. There are also some similar agreements pertaining to earlier time periods. The agreement provides, in relevant part:

> Any subsidiary incurring an annual loss on a tax basis that results in a tax benefit on the consolidated return shall be reimbursed in cash in an amount determined in a manner consistent with the allocation of taxes to profitable subsidiaries. Refunds due subsidiaries from the Company which cannot be fully funded when due then will be carried on the subsidiary's books as a "loan to parent" and will accrue interest at not less than the Federal Funds Rate. The occurrence of this event is unusual and its likelihood of happening is considered remote. All loans between parent and subsidiary will be in accordance with applicable federal regulations regarding affiliate transactions.

The parties have proffered no extrinsic evidence bearing on the interpretation of this contract. The Court consequently interprets it as a matter of law. Cf. Southland Corp. v. Emerald Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986).

Before interpreting the tax sharing agreement, however, it is necessary to consider the FDIC's contentions that portions or all of it are invalid. It is convenient for these purposes to consider two relevant aspects of the agreement separately. First, the agreement appears to establish some guidelines for how tax liabilities and refunds are allocated. These will be referred to as the "allocation guidelines." Second, the

5

agreement appears to allow Bancorp to defer payment of refunds by, in effect, "borrowing" the refund from the subsidiary. This will be referred to as the "line of credit." Separate consideration of these two portions of the agreement is useful because "[t]he California cases take a very loose view of severability, enforcing valid parts of an apparently indivisible contract where the interests of justice or the policy of the law . . . would be furthered." 1 B.E. Witkin, Summary of California Law: Contracts § 432 (9th ed. 1987).

C.  **Validity of the Tax Allocation Agreement**

The FDIC argues that the agreement is invalid or not binding on the FDIC for a number of reasons:[4]

1)  *12 U.S.C. § 1823(e).* That subsection provides that

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--
> . . .
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution . . . .

The FDIC argues that the agreement violates 12 U.S.C. § 1823(e) because it is not "contemporaneous[] with the acquisition of the asset by the depository institution."

If one views the "asset" as the refunds, this view seems literally correct, since the refunds were paid long after the agreement took effect. However, this reasoning would ban all tax

---

[4] Even if the agreement is binding, the FDIC as receiver appears to have the power to repudiate it under 12 U.S.C. § 1821(e). The FDIC does not argue this issue, however, so it need not be considered further.

6

allocation agreements because such agreements necessarily have to be prospective. "[S]atisfaction of the contemporaneousness requirement should be considered in light of commercial reality." RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th Cir. 1993). In this case, it is consistent with commercial reality, and with the FDIC's own recommendations, for consolidated groups of corporations to enter into prospective tax allocation agreements. It is likewise consistent with commercial reality for banks to approve lines of credit in advance of the actual borrowing. Consequently, the Court finds that § 1823(e) does not prevent the tax allocation agreement from binding the FDIC.[5]

   2)   The Common Law D'Oench Duhme Doctrine. The common-law D'Oench Duhme doctrine largely overlaps with 12 U.S.C. § 1823(e). However, "[f]or D'Oench Duhme to apply, there at least must be a showing that the [borrower] lent himself to a scheme or arrangement whereby the banking authority . . . was or was likely to be misled." Murphy v. FDIC, 38 F.3d 1490, 1498 (9th Cir. 1994) (en banc) (internal quotation marks omitted). Here, the agreement was sufficiently explicit that the FDIC could not have been misled as to Bancorp's potential right to "borrow" the refunds. The FDIC in fact knew in early 1993 that the

---

[5] The FDIC also argues that the ratification by the board of directors is ineffective because the tax portion of the agreement was an addendum to the agreement as adopted by the board. The addendum was incorporated by reference, however, and it appears that an explicit incorporation by reference suffices for § 1823(e). See FDIC v. Kasal, 913 F.2d 486, 491 (8th Cir. 1991); see also RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th Cir. 1993) (§ 1823(e) "does not require that such agreements be confined to the face of any one particular lending/borrowing document") (quoting RTC v. Oak Apts. Joint Venture, 966 F.2d 995, 999 (5th Cir. 1992)).

7

arrangements for passing tax refunds through Bancorp were a source of potential problems. (Pl.'s Ex. 19.)

3) <u>Indefiniteness</u>. The FDIC also contends that the tax allocation agreement is too indefinite to be binding. It cites <u>In re Florida Park Banks Inc.</u>, 110 B.R. 986 (Bankr. N.D. Fla. 1989), where the consolidated group had a "policy" regarding tax allocation. The court there found that the policy did not rise to the level of an agreement that could override the rule of <u>Bob Richards</u>, so the FDIC got the tax refund.

The tax allocation guidelines at issue here are extremely vague. They state that loss-making subsidiaries will receive tax benefits "in an amount determined in a manner <u>consistent with</u> the allocation of taxes to profitable subsidiaries" (emphasis added). The agreement also provides that tax payments by profitable subsidiaries "will be calculated <u>based on</u> the individual subsidiary's stand-alone estimated payment liability" (emphasis added).

The line of credit provision in the agreement is not as vague. However, nothing is said about how long Bancorp may continue to hold on to the borrowed funds. The interest rate must be "not less than the Federal Funds Rate," but the actual rate is not specified.

California courts are tolerant of indefinite terms in contracts. Thus, for example, courts may fill in an omitted duration term. 1 Witkin, <u>supra</u>, § 152. The interest rate could be implied from that which comparable borrowers pay. The allocation guidelines may be seen as setting very broad outer limits to how the tax burdens and benefits are spread, excluding,

8

for example, payments utterly unrelated to an individual subsidiary's stand-alone payment liability. Consequently, the tax allocation guidelines and line of credit provisions of the tax allocation agreement are not so indefinite as to be unenforceable.

    4) <u>Lack of Consideration.</u> The FDIC also contends that the agreement lacked consideration to the Bank. Consideration may be any benefit however small or contingent. Consolidated group tax reporting offered the Bank at least the possibility of lower tax burdens as a consequence of the benefits of consolidation discussed extensively in the FDIC's own papers. This is sufficient consideration for the tax allocation agreement.

    5) <u>Illegality.</u> The FDIC appears to argue that the tax refund line of credit from the Bank to Bancorp is contrary to applicable law and regulations. However, the tax allocation agreement itself provides that credit will be extended only in a way consistent with applicable regulations, which would seem to cure any possible illegality.

D. <u>Effect of the Agreement on the Agency and Trust Relationship</u>

    Having concluded that the tax allocation agreement is binding on the FDIC, it is now necessary to consider whether the agreement destroys the principal-agent relationship recognized in <u>Bob Richards</u>, <u>supra</u>.

    Bancorp first contends that the very existence of a tax allocation agreement destroys the principal-agent relationship. It bases this contention on the fact that there was no such agreement in <u>Bob Richards</u>. However, this is an excessively

///

9

narrow interpretation of that case. This Court interprets Bob Richards as holding that unless the corporations in a consolidated group agree otherwise, the parent acts as their agent for payment of tax and refunds. This rule is like many other gap-filling rules in contract law which provide a default in the absence of applicable agreement by the parties, e.g. U.C.C. § 2-205 (offer by merchant in signed writing irrevocable "during the time stated or if no time is stated for a reasonable time"). Parties to a contract do not override a gap-filling rule simply by reaching explicit agreement on some other matter. Rather, the terms of their agreement must expressly or impliedly override the gap-filling rule itself. It is thus necessary to consider whether the terms of the tax allocation agreement expressly or impliedly override the Bob Richards principal-agent relationship.

Bancorp points to the language "[a]ny subsidiary incurring an annual loss on a tax basis that results in a tax benefit on the consolidated return shall be reimbursed in cash" in the tax allocation agreement. It contends that the use of the word "reimbursed" indicates that a debtor-creditor relationship was intended. It also argues that the refunds owing the Bank were recorded as a "receivable" on its books. It cites In re Franklin Sav. Corp., 159 B.R. 9, 29 (Bankr. D. Kan. 1993), where the court relied on the words "reimbursement" and "credits" to conclude that a tax allocation agreement established a debtor-creditor relationship.

In deciding whether a transaction intended to create a debtor-creditor relationship, however, a court must examine the

economic reality of the transaction rather than the words used. See In re Woodson Co., 813 F.2d 266, 272 (9th Cir. 1987). The economic reality here is that, except in the "unusual" circumstances in which the agreement allowed Bancorp to borrow the refund, the agreement required Bancorp to give the Bank its share of the refund in cash and immediately. This strongly suggests an intent to maintain a principal-agent relationship unless Bancorp borrowed the refund pursuant to the terms of the agreement.

Furthermore, the agreement itself recognizes that any loan from the Bank to Bancorp would be subject to regulations governing loans to affiliates. Although the parties do not discuss these regulations in their papers,[6] it appears that 12 U.S.C. § 371c(c)(1) applies here. That subsection forbids unsecured loans from a Federal Reserve member bank to its holding company, while § 371c(e) allows the Federal Reserve Board to authorize such loans by regulation or order. 12 U.S.C. § 1828(j)(1) extends the restrictions of § 371c to all federally insured banks. For a debtor-creditor relationship to arise

---

[6] Bancorp does attach as an exhibit to its complaint some excerpts from an FDIC examination manual containing an extensive discussion of § 371c. (Pl.'s Ex. 4, at 8-11.) The FDIC cites Lincoln Savings & Loan Association v. Wall, 743 F. Supp. 901 (D.D.C. 1990), where the court upheld the Federal Home Loan Bank Board's decision to put Charles Keating's thrift into receivership. In doing so, the court found that an agreement requiring the thrift to make large payments to its parent, ostensibly for the purpose of paying the consolidated group's tax liability, fell afoul of the then-existing regulatory restrictions on a thrift's lending to its parent. Lincoln Savings, 743 F. Supp. at 905-11. Those restrictions (then codified at 12 C.F.R. § 583.4 (1986), and since repealed) were similar to those in 12 U.S.C. § 371c.

between Bancorp and Bank, then, there would presumably have to be some further agreement through which Bancorp supplied collateral meeting the requirements of § 371c(c)(1).

The Court consequently holds that the tax allocation agreement intended to abrogate the principal-agent relationship between Bank and Bancorp only when Bancorp borrowed the refunds from Bank under the terms of the agreement. Bancorp holds Bank's share of the refunds in trust, as the Bank's agent, unless and until Bancorp borrows them under the terms of the agreement.

There remains the question whether Bancorp could properly borrow the refunds at issue here under the terms of the agreement. The language of the agreement itself provides the answer. Bancorp is allowed to borrow "[r]efunds . . . which cannot be fully funded when due." Bancorp received the refunds at issue here in cash and placed them in a segregated account. Therefore, it had the wherewithal to pay the refunds immediately to the Bank. The requirement that the refunds "cannot be fully funded" was thus not met here. Bancorp had no right to borrow the refunds under the tax allocation agreement, and it therefore continued to hold them in trust.[7] Bancorp's motion for summary judgment is thus DENIED.

E. Funds in the Segregated Tax Refund Account

The FDIC's cross-motion for summary judgment seeks an order directing that the whole of Bancorp's segregated tax refund account be turned over to it. To decide this motion, it is

---

[7] It is also possible that Bancorp had no right to borrow the refunds from the Bank because its doing so would be inconsistent with applicable regulations.

necessary to determine what portion of that money represents refunds owed to the Bank.

The Court does not believe that the parties have adequately briefed the issue of what share of the refunds belongs to the Bank. The resolution of that issue depends on how refunds received by Bancorp are supposed to be allocated to other members of the consolidated group. The tax allocation agreement may shed some light on this question. Background rules of law, such as those stated in Bob Richards, may also shed light on this question. The Court consequently directs the parties to provide further briefing on what share of the refunds belongs to the Bank. The FDIC is to file an additional brief, no longer than 25 pages, by March 13, 1995. Bancorp may file an opposition by March 27, 1995. The FDIC may file a 10-page reply by April 3, 1995. At that point, the Court may decide the FDIC's motion for partial summary judgment on the papers, or it may schedule an additional hearing.

F. Objections to Evidence

Bancorp objects extensively to the declaration of Carol Turner filed by FDIC. The primary objection is that Ms. Turner is rendering inadmissible lay opinion. Ms. Turner states that she has worked for over fourteen years as a tax accountant for the FDIC. This would normally justify her testifying as an expert on tax accounting. The objections on the ground of inadmissible lay opinion are thus overruled.

Ms. Turner's declaration appears to rely on tax records of the Bank of San Diego. Such documents are admissible hearsay under Fed. R. Evid. 803(6). Expert witnesses are also permitted

13

to rely on inadmissible evidence if "of a type reasonably relied on by experts in the particular field." Fed. R. Evid. 703. Hearsay objections to Ms. Turner's declaration are thus overruled.

Ms. Turner's declaration contains expert opinion on pure questions of law. The declaration of Diane L. Gilabert filed by Bancorp also contains expert opinion on questions of law. Expert opinion on questions of law is inappropriate. <u>United States v. Brodie</u>, 858 F.2d 492, 496 (9th Cir. 1988). The Court has reached an independent conclusion on all questions of law and has not taken expert opinion as authoritative on such issues.

Bancorp has also filed evidentiary objections to the FDIC's memorandum of points and authorities. A memorandum of points and authorities is not evidence and evidentiary objections to it are inappropriate.

### G. Conclusion

Bancorp's motion for summary judgment on its first claim is DENIED. The FDIC's motion for partial summary judgment is continued pending further briefing as directed by this order.

IT IS SO ORDERED.

Dated: Feb. 28, 1995

IRMA E. GONZALEZ
United States District Judge

14

1  Copies distributed/mailed to:

2  JEFFREY ISAACS ESQ
   GERALD P KENNEDY ESQ
3  MARTINA MENDE ESQ
   PROCOPIO CORY HARGREAVES AND SAVITCH
4  530 B ST STE 2100
   SAN DIEGO CA 92101
5
   SCOTT HUGHES ESQ
6  FEDERAL DEPOSIT INSURANCE CORPORATION
   LEGAL DIVISION
7  4 PARK PLAZA
   IRVINE CA 92715
8
   ANTHONY J DAIN ESQ
9  DAIN & LI
   555 WEST BEECH ST STE 222
10 SAN DIEGO CA 92101

11 MICHAEL F DUHL ESQ
   JOHN L ROGERS ESQ
12 HOPKINS & SUTTER
   THREE FIRST NATIONAL PLAZA STE 4100
13 CHICAGO IL 60602

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28