Tagged Opinion



**ORDERED in the Southern District of Florida on November 22, 2011.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 09-19940-BKC-LMI |
| | Jointly Administered |
| BANKUNITED FINANCIAL CORPORATION, *et al.,* | Chapter 11 |
| Debtors. | |

_____/

| | |
|---|---|
| BANKUNITED FINANCIAL CORPORATION, BANKUNITED FINANCIAL SERVICES, INC., CRE AMERICA CORPORATION, and BU REALTY CORPORATION, | Adv. No. 10-02872-BKC-LMI |
| Plaintiffs, | |
| v. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver of BankUnited, FSB, | |
| Defendant. | |

_____/

**MEMORANDUM OPINION ON ORDER GRANTING SUMMARY JUDGMENT
IN FAVOR OF PLAINTIFFS AND
DENYING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS**

This matter came before me on September 13, 2011 on cross-motions for summary judgment filed by the Plaintiffs, BankUnited Financial Corporation ("BUFC" or "Holding Company"), BankUnited Financial Services, Incorporated ("BUFS"), CRE America Corporation ("CRE") (collectively "BankUnited Debtors" ) and BU Realty Corporation  ("BU Realty" collectively with the BankUnited Debtors, the "Plaintiffs") and the Cross-Motion for Summary Judgment filed by the Defendant Federal Deposit Insurance Corporation, in its capacity as Receiver ("FDIC-R" or "Defendant")  of BankUnited, FSB ("BUFB" or the  "Bank").[1]

## FACTUAL AND PROCEDURAL HISTORY

On December 31, 1997, the Holding Company and the Bank entered into an Income Tax Allocation Agreement ("TAA"). The TAA defined the appropriate methods for allocating current and deferred income tax assets and liabilities among the Holding Company, the Bank, and the other members of the Affiliated Group identified in the TAA (the "BU Consolidated Tax Group").[2]  Under the TAA the Bank was to make all tax payments on behalf of the BU Consolidated Tax Group. Any members with net tax payables were then responsible for

---

[1] Plaintiffs' Motion for Partial Summary Judgment on Count I of the Complaint and for Summary Judgment on Count II of the Complaint (ECF #81); Defendant's Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint (ECF #90); Defendant's Memorandum (A) in Opposition to Plaintiff's Motion for Summary Judgment on Count I of the Complaint and Summary Judgment on Count II of the Complaint and (B) in Support of its Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint (ECF #91);  Defendant's Memorandum (A) in Opposition to Plaintiff's Motion for Summary Judgment on Count I of the Complaint and Summary Judgment on Count II of the Complaint and (B) in Support of its Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint (ECF #92); Plaintiffs' Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint, and Reply in Support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint and Summary Judgment on Count II of the Complaint (ECF #102); Defendant's Reply in Support of Its Cross-Motion for Summary Judgment on Counts I and II of the Complaint (ECF #103), Defendant's Notice of Supplemental Authority (A) in Opposition to  Plaintiffs' Motion for Partial Summary Judgment on Count I of the Complaint and for Summary Judgment on Count II of the Complaint and (B) in Support of its Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint (ECF #111), Plaintiffs' Response to Defendant's Notice of Supplemental Authority (ECF #114).
[2] The TAA refers to other unnamed members of the "Affiliated Group" within the meaning of Section 1504 of the Internal Revenue Code.   Based on the various pleadings, I have assumed that the other Plaintiffs were a part of the BU Consolidated Tax Group.  However, the identity of the other members is not relevant to this opinion.

reimbursing the Bank for each member's proportional share of liability. Conversely, the Bank was obligated to reimburse members that had a net tax receivable with respect to any tax refund held by the Bank. Both Plaintiffs and Defendant agree that the TAA is controlling.

On May 21, 2009 BUFB was closed by the Office of Thrift Supervision ("OTS") and the FDIC-R was appointed as Receiver. On May 22, 2009, BUFC and the other BankUnited Debtors filed petitions under Chapter 11 of the Bankruptcy Code.

BUFC filed a consolidated tax return titled "Amended U.S. Corporation Income Tax Return" for the fiscal year ended September 30, 2008 on Form 1120X filed by "BankUnited Financial Corp & Subs C/O DSI" on or about September 10, 2009 (the "Amended FY 2007 Return"), and a certain consolidated tax return titled "U.S. Corporate Income Tax Return" for the fiscal year ended September 30, 2009 on Form 1120 filed by "BankUnited Financial Corporation and Subsidiaries" on or about June 14, 2010 (the "FY 2008 Return").

In conjunction with the filing of the Amended FY 2007 Return, on September 30, 2009, BUFC filed a Form 1139 "Corporate Application for Tentative Refund" ("Form 1139") through which it claimed a refund of $5,566,878 (the "FY 2007 Refund"). In conjunction with the filing of the FY 2008 Return, on June 17, 2010, BUFC filed a Form 1139 through which it claimed a refund of $42,552,226 (the "FY 2008 Refund") for taxes paid in fiscal years 2003 (fiscal year ending September 30, 2004), 2005 (fiscal year ending September 30, 2006), and 2006 (fiscal year ending September 30, 2007) (the "FY 2008 Refund Claim"), representing the maximum refund available to the BU Consolidated Tax Group.

On or about June 13, 2011, BUFC and the FDIC-R jointly filed an amended return for FY 2008 (the "Amended FY 2008 Return") pursuant to a Settlement Agreement dated as of June 4, 2011 (the "Settlement Agreement").  The anticipated tax refunds from the Amended FY 2007

3

Return and the Amended FY 2008 Return will be referred to hereinafter collectively as the "Tax Refunds".

The FDIC-R filed proofs of claim in each of the BankUnited Debtors' bankruptcy cases; those proofs of claim include the FDIC-R's assertion of ownership of the Tax Refunds.[3]   The Plaintiffs filed claims in the Bank receivership (the "Receivership Claims").

On April 21, 2010 the Plaintiffs filed a 22 count complaint (ECF #1) (the "Complaint") objecting to the FDIC-R proofs of claim on the grounds that any claim relating to the Tax Refunds are at most an unsecured claim, seeking a declaratory judgment that the Holding Company owns the Tax Refunds, and seeking additional relief under several other counts including a determination that the Receivership Claims were deemed allowed due to the FDIC-R's alleged untimely objection to the Receivership Claims.  The FDIC-R filed a Motion for Withdrawal of the Reference (ECF #11) alleging that considerations of Title 12 mandated the reference be withdrawn.[4]

On August 23, 2010, the district court entered its order Granting in Part and Denying in Part the Motion to Withdraw the Reference. *BankUnited Financial Corp. v. Federal Deposit Insurance Corp.,* 436 B.R. 216 (S.D. Fl. 2010).  The district court held that mandatory withdrawal was not required[5] except with respect to one discreet Title 12 issue related to the timeliness of the FDIC-R's objection to the Receivership Claims, on which issue the district

---

[3] The FDIC-R amended the proofs of claim but the amendments did not alter the FDIC-R's claim to the Tax Refunds.  After the Amended Complaint was filed, and pursuant to the Settlement Agreement, the proofs of claim were amended again.

[4] 28 U.S.C. §157(d) provides that "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."

[5] *See supra* note 4.

court ruled. The district court declined to withdraw the balance of the Complaint,[6] rejecting the

FDIC-R's argument that 12 U.S.C. §1821(d)(6)[7] confers sole jurisdiction of any claim against an

FDIC receivership on the district court to the exclusion of any other court, including the

bankruptcy court.  The district court held, citing to other bankruptcy cases that adjudicated

statutorily described district court matters, like ERISA, that the bankruptcy court was capable of

adjudicating claims filed against the FDIC-R since "[a]s a general matter, such issues – absent

indication that they may involve substantial and material consideration – are routinely

adjudicated by bankruptcy courts." 436 B.R. at 220.  The district court observed in reaching its

holding that "[t]he bankruptcy court is an adjunct of the district court.  Absent express contrary

indication, statutory grant of jurisdiction to a district court does not divest the bankruptcy court

of coextensive referral jurisdiction." *Id*. at 221.

Soon thereafter, the Plaintiffs filed an Amended Complaint (ECF #67), to which the

FDIC-R filed its Answer and Affirmative Defenses (ECF #73).  Subsequently the parties filed

their cross-motions for partial summary judgment with respect to Count I and Count II of the

Amended Complaint, agreeing that there are no disputed material facts.  Count I of the Amended

Complaint is the Plaintiffs' objection to the FDIC-R's claims; Count II seeks a declaration by

this Court that the Tax Refunds are property of the Holding Company, and not of the Bank or the

FDIC-R as its receiver.

The adjudication of the cross-motions was delayed for approximately eight months while

the parties negotiated the Settlement Agreement pursuant to which all matters between the

---

[6] *See supra* note 4.
[7] 12 U.S.C. §1821(d)(6) requires that "the claimant may request administrative review of the claim... or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."

Plaintiffs and the FDIC-R were resolved other than a portion of Counts I, and Count II, of the Amended Complaint.[8]  The Settlement Agreement addresses the disposition of the Tax Refunds and the amount of the FDIC-R's claims, if any, in the BankUnited Debtors' bankruptcy cases, based on the outcome of the dispute over ownership of the Tax Refunds.[9]

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure is applicable to this adversary proceeding under Fed. R. of Bankr. P. 7056.  Summary judgment is appropriate where the "pleadings, dispositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). If there are no material facts in dispute, and only a purely legal question remains to be decided by the court, then granting summary judgment is appropriate. *See, e.g., Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995) (finding summary judgment appropriate when there were no material facts in dispute); *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 961 (3d Cir. 1981) (noting that interpreting the provisions of a consent order was a question of law and therefore, appropriate for summary judgment).  As previously noted, the parties agree this matter can be resolved on summary judgment.[10]

---

[8] Also unresolved is a dispute between the FDIC-R and the Committee of Unsecured Creditors (on behalf of the Plaintiffs) regarding ownership of the proceeds of Directors' and Officers' insurance policies.

[9] Under the Settlement Agreement, if the FDIC-R is determined to be the owner of the Tax Refunds, BUFC will receive the first $2.0 million of the Tax Refunds received by the FDIC-R and the FDIC-R will receive the remainder of the Tax Refunds and have no further claims against the BankUnited Debtors. Alternatively, if BUFC is determined to be the owner of the Tax Refunds, the FDIC-R will receive the first $7.5 million of the Tax Refunds received by BUFC, and the FDIC-R will have an allowed non-priority general unsecured claim of $45 million against BUFC's bankruptcy estate.

[10] In their Response in Opposition to Defendant's Cross-Motion for Summary Judgment on Counts I and II of the Amended Complaint, and Reply in Support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint and Summary Judgment on Count II of the Complaint (ECF #102) the Plaintiffs argued that there was a

## JURISDICTION

The Amended Complaint alleges that this Court has jurisdiction pursuant to 12 U.S.C.

§§1819(b)(2)(A)[11] and 1821(d)(6)[12] and 28 U.S.C. §§1331[13] and 1334.[14] Amended Complaint

¶6. The Amended Complaint further alleges that the "matter is a core proceeding pursuant to 28

U.S.C. §157(b)(2)(A), (B), (C), (E), (F), (H), and (O)." Amended Complaint, ¶8.  The Answer

denies all the jurisdictional allegations of the Amended Complaint.

Sometime between when the Cross Motions for Summary Judgment were filed and the

scheduled oral argument on the Motions for Summary Judgment, the United States Supreme

Court issued its opinion in *Stern v. Marshall,* 131 S. Ct. 2594  (2011).  Since its release, a

maelstrom of opinions and articles have been written about the scope of *Stern,* ranging in tone

from "much ado about nothing" to "the end of the bankruptcy world as we know it."  In light of

this I determined it appropriate to issue an Order Setting Hearing to Determine Jurisdictional

Issues (ECF # 142).[15]

At the hearing and in subsequent briefs filed by the parties,[16] the FDIC-R resurrected the

Title 12 argument previously rejected, for the most part, by Judge Huck and further argued that

---

scrivener's error in the TAA, suggesting there might be a disputed issue of fact.  However, the Plaintiffs receded
from this argument at the September 13, 2011 hearing.

[11] "Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the
Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States." 12 U.S.C.
§1819(b)(2)(A).

[12] See *supra* note 7.

[13] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or
treaties of the United States." 28 U.S.C. §1331.

[14] "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--
(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the
estate." 28 U.S.C. §1331(e).

[15] The order set oral argument, without briefing on the jurisdictional issues, with the caveat that, should the parties
either deem Judge Huck's prior order dispositive of the jurisdiction issue, or otherwise consented to my jurisdiction,
the hearing would be canceled.

[16] Defendant's Memorandum of Law on the Jurisdictional Issues Raised by the Court's Order of August 9, 2011
(ECF #151); Plaintiff's Post-Hearing Memorandum of Law in Support of the Court's Authority to Enter Final

the bankruptcy court does not have core jurisdiction over the remaining disputes because: (a) there is no remaining claim objection and (b) adjudication of a dispute involving a pre-petition contract right that could be resolved in a non-bankruptcy forum cannot be a core proceeding.

The FDIC-R's renewed Title 12 argument stems from Judge Huck's denial of the vast majority of the motion to withdraw reference, in which Judge Huck observed that the bankruptcy court is an "adjunct" of the district court. In *Stern v. Marshall*, Justice Roberts rejected appellant's argument that, as an adjunct of the district court, the bankruptcy court can exercise jurisdiction over a matter traditionally within the sole jurisdiction of an Article III tribunal.  In noting that the bankruptcy court has the legitimate power to enter final judgments, subject only to a party's right to appeal, the Chief Justice observed that "a bankruptcy court can no more be deemed a mere 'adjunct' of the district court than a district court can be deemed such an 'adjunct' of the court of appeals." 131 S. Ct. at 2619. Based on this phrase in *Stern*, the FDIC-R argues that I must revisit Judge Huck's ruling since its basic premise had now been removed.

I reject the FDIC-R's argument for two reasons.  First, and most obvious, it is not my place to determine that Judge Huck's ruling is no longer good law in this case.  Judge Huck considered the FDIC-R's argument that a bankruptcy court can never hear Title 12 matters. Judge Huck rejected that argument, which is before me now, with the limited exception noted in his opinion.  To the extent that the premise upon which Judge Huck relied has been altered by *Stern,* it is not my place to make that decision.  That will need to await appellate review.[17]

---

Judgment on Counts I and II of the Amended Complaint (ECF #152); and Plaintiff's Notice of Filing of Supplemental Authority (ECF #153).

[17] The FDIC-R could have also either renewed its Motion to Withdraw, or sought reconsideration of Judge Huck's earlier ruling in light of *Stern*.  The FDIC-R did not do either.

Second, I disagree with the FDIC-R that *Stern* altered Judge Huck's original ruling. Judge Huck cited many cases, most or all of which post-date the *Marathon* opinion,[18] in which, notwithstanding the statutory and exclusive jurisdiction of Article III tribunals in particular kinds of disputes, such matters are routinely heard by bankruptcy courts. *See, e.g., Browning v. Levy*, 283 F.3d 761, 779 (6th Cir. 2002) ("[E]xclusive jurisdiction of the district courts over certain ERISA claims does not preclude such claims from being brought in bankruptcy proceedings, because the bankruptcy court is not a free standing court, but rather a unit of the district court") (quotations omitted); *Resolution Trust Corp. v. Overland Park Fin. Corp.,* 182 B.R. 865, 870 (D. Kan. 1995) ("[the bankruptcy] court is indeed an appropriate forum in which to determine the competing rights of parties in a tax refund resulting from a consolidated return"); *In re Perdue,* 2010 WL 907951, at *4 (N.D. Oh. 2010) (refusing to withdraw reference in matter involving application of Title 12); *In re Sahni,* 227 B.R. 748, 751 (D. Kan. 1998) (concluding that application of the fraudulent conveyance provision of Title 12 does not require withdrawal). *See also Emerald Int'l Invs., Inc. v. Fed. Deposit Ins. Corp. (In re Emerald Int'l Invs., Inc.)*, 190 B.R. 701, 704 (Bankr. S.D. Fla. 1995) ("[T]he Eleventh Circuit remanded the §1821(d)(6)(A) proceedings to be heard by the Bankruptcy Court. Accordingly, the Bankruptcy Court has been directed to determine a matter traditionally heard by the District Courts"). While Justice Roberts has declared bankruptcy courts to be no "mere adjuncts" because of the broad jurisdictional authority we enjoy to enter final orders in many matters, the bankruptcy courts are, nonetheless, still units of the district court.[19] Any authority we exercise is based solely on the orders of

---

[18] *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)

[19] 28 U.S.C. §151 provides "[i]n each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court."

referral which delegate bankruptcy jurisdiction that otherwise rests solely with Article III

tribunals.  Indeed, as I pointed out to counsel for the FDIC-R at the September 13, 2011 hearing,

Judge Huck specifically refers to the bankruptcy court's "coextensive referral jurisdiction,"

which *Stern* has not changed. Moreover, I am not going to be one of those bankruptcy judges

who seizes on, and seeks to analyze, every line in the *Stern* opinion to determine what ripples

may emerge from the self-described isolated pebble dropped in the jurisdictional waters. I agree

with Judge Williamson's opinion in *In re Safety Harbor Resort and Spa,* 456 B.R. 703, 718

(Bankr. M.D. Fla. 2011) – "[t]he Supreme Court does not ordinarily decide important questions

of law by cursory dicta." As a bankruptcy court, I will not "reverse" Judge Huck's decision, or

ignore other court rulings that are binding on me, based on extrapolations of what the Chief

Justice took great pains to emphasize is the narrow holding of *Stern*.

I now turn to that holding.  In ruling that Congress exceeded its constitutional authority in

28 U.S.C.§157(b)(2)(C) because "the Bankruptcy Court lacked the constitutional authority to

enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on

a creditor's proof of claim…", 131 S.Ct. at 2620, Justice Roberts wrote that the bankruptcy

court's exercise of core jurisdiction is appropriate where, for example, "the action at issue stems

from the bankruptcy itself or would necessarily be resolved in the claims allowance process."

131 S. Ct. at 2618.  My exercise of core jurisdiction of the two counts still pending before me

satisfies both the express holding in *Stern* and the constitutional framework reflected in each of

these criteria.[20]

Nonetheless, the FDIC-R argues that I do not have jurisdiction to hear this claim because

(a) determination of what is property of the estate is not a core matter, is not a matter that stems

---

[20] The FDIC-R has not argued that Count II is not a counterclaim as described in section 157(b)(2)(C).

from the bankruptcy, when the property interest can be determined outside bankruptcy and does not involve a substantive bankruptcy right, and (b) Count II is not necessarily resolved as part of the claim objection because there is no more pending claim objection.

As the FDIC-R acknowledges in its Memorandum of Law in Support of Jurisdiction (ECF #151), 28 U.S.C. §157(b)(2) sets forth a non-exclusive list of what is considered a core proceeding.  Because the determination of what is property of the estate is not listed in section 157(b)(2), the FDIC-R directs us to judicially created tests that support the argument that the process of determining whether the Tax Refunds are property of the estate is non-core.

The FDIC-R relies on *Wood v. Wood (In re Wood)*, 825 F.2d 90 (5th Cir. 1987)[21] in which the Fifth Circuit outlined a test to determine whether a proceeding is a core proceeding.  The Supreme Court in *Stern* has refined the definition of what is a core proceeding,[22] and, to the extent the *Wood* test conflicts with that definition, *Wood* is no longer good law.  However, I do not find that *Wood* conflicts with *Stern.* Under the *Wood* test:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be *related* to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

825 F. 2d at 97.[23]

---

[21] The Eleventh Circuit relied on the *Wood* test in *In re Toledo*, 170 F. 3d 1340, 1348 (11th Cir. 1999) in its analysis of what constitutes a core proceeding.

[22] *Safety Harbor*, 456 B.R. at 709-10.

[23] Indeed, Justice Roberts specifically stated that the very definition of what are core proceedings is "those that arise in a bankruptcy case or under title 11." 131 S.Ct. at 2605. However Justice Roberts then reviewed the list set forth by Congress in 11 U.S.C. §157(b)(2) as illustrative of what is core. "It is hard to believe that Congress would go to the trouble of categorizing 16 different types of proceedings that should receive 'core' treatment, but then fail to specify how to determine whether those matters arise under Title 11 or in a bankruptcy case if … the latter inquiry is determinative of the bankruptcy court's authority." *Id.* Based on Justice Roberts' interpretation that Congress intended that all matters listed in section 157(b)(2) are core, he then turned to his constitutional analysis –

Contrary to the FDIC-R's argument, what is or is not property of a bankruptcy estate is an issue that stems from the bankruptcy itself (*Stern),* one that can only arise in a bankruptcy proceeding (*Wood*), since the concept of what is property of a bankruptcy estate does not exist outside of a bankruptcy case.[24] Moreover, the fact that the determination of whether the Tax Refunds are property of the estate is determined under non-bankruptcy law and is an issue that could be resolved in a non-bankruptcy forum is irrelevant since the issue of what is property of the estate is virtually always a matter of state law or other non-bankruptcy law. *Butner v. U.S.,* 440 U.S. 48 (1979). And, in the absence of a bankruptcy case, unresolved disputes over claims will always be resolved outside of bankruptcy court.

---

> [W]e agree with Pierce that designating all counterclaims as "core" proceedings raises serious constitutional concerns … [W]e will, where possible, construe federal statutes so as "to avoid serious doubt of their constitutionality." … But that "canon of construction does not give [us] the prerogative to ignore the legislative will in order to avoid constitutional adjudication." … In this case, we do not think the plain text of §157(b)(2)(c) leaves any room for the canon of avoidance. We would have to "rewrit[e]" the statute, not interpret it, to bypass the constitutional issue §157(b)(2)(c) presents.

*Id*. (citations omitted). This portion of the *Stern* opinion has given rise to at least one court questioning whether it even has authority to issue proposed findings of fact and conclusions of law with respect to those matters listed in section 157(b)(2) as core. *See In re Blixseth,* 2011 WL 3274042, at *12 (Bankr. D. Mont. 2011) ("[u]nlike in non-core proceedings, a bankruptcy court has no statutory authority to render findings of fact and conclusions of law for core proceedings that it may not constitutionally hear. While 28 U.S.C. § 157(c)(1) allows a bankruptcy judge to render findings and conclusions in 'a proceeding that is not a core proceeding but that is otherwise related to a case under title 11,' no other code provision allows bankruptcy judges to do the same in core proceedings. Similarly, no provision allows parties to consent to a bankruptcy court making final decisions in core proceedings as 28 U.S.C. § 157(c)(2) allows parties to consent for non-core proceedings"). However, both the Chief Justice in *Stern* and the *Blixseth* court fail to address the import and meaning of 28 U.S.C. §157(b)(4) which provides that "non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2)." This statute section is a congressional caveat, a recognition, that section 157(b)(2) provides an illustrative list of what proceedings may be considered core matters, but which are nonetheless subject to the same analysis of "arising in," "arising under," or "related to." This is the flip side of Pierce's argument, appropriately rejected by the Chief Justice, that there can be core proceedings that do not arise in or arise under a Title 11 case. However the import of this subsection with respect to the analysis in *Stern* or subsequent cases applying *Stern* are not matters I need to decide today, if ever.  *Stern* has laid out the test of what constitutes a constitutional core proceeding under 28 U.S.C. §157(b)(2)(C), and my holding depends solely on that unequivocal and unambiguous ruling.

[24] The determination of what is or is not property of the estate has been widely recognized as a core matter.  *See In re New Century Holdings, Inc.,* 387 B.R. 95, 105 (Bankr. D. Del. 2008) and cases cited therein; *accord In re Toledo,* 170 F. 3d at 1348.

As Judge Walrath recently wrote in *In re Washington Mutual, Inc.*, 2011 WL 4090757, at

*5-6 (Bankr. D. Del. 2011):

> It is without question that bankruptcy courts have exclusive jurisdiction over property of the estate. *See* 28 U.S.C. § 1334(e) (stating that the court in which a case under title 11 is commenced or is pending "shall have exclusive jurisdiction – (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"). *See also, Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363-64 (2006) (stating that "[c]ritical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property…").
>
> That jurisdiction includes jurisdiction to decide whether disputed property is, in fact, property of the estate. *See, e.g., Salander O'Reilly Galleries,* 2011 WL 2837494, at *12-13 (concluding that the bankruptcy court had core jurisdiction to decide priority of estate's and creditor's asserted interests in a piece of art and denying request for arbitration of issue); *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.,* 435 B.R. 894, 904-05 (Bankr. D. Del. 2010) (holding that the bankruptcy court had exclusive jurisdiction to determine whether or not disputed aircraft was property of the estate at the time of its sale); *Williams v. McGreevey (In re Touch Am. Holdings, Inc.,* 401 B.R. 107, 117 (Bankr. D. Del. 2009) (stating approvingly that "[v]arious courts have concluded that matters requiring a declaration of whether certain property comes within the definition of 'property of the estate' as set forth in Bankruptcy Code §541 are core proceedings.").

The FDIC-R also argues that the resolution of the dispute over the Tax Refunds is non-

core; the issue does not necessarily need to be resolved in the claims allowance process as there

is no longer a pending claim objection since the Settlement Agreement resolved the claim

objection. This argument is completely without support. The allocation of the Tax Refunds and

the treatment of any claims of the FDIC-R are premised entirely on the resolution of the claim

objection. The Settlement Agreement did not make the objection go away; it only addressed the

consequences of my ruling on the objection.

The resolution of the claim objection and determination of the ownership of the Tax

Refunds are identical disputes. The FDIC-R filed its proofs of claim to protect its asserted

ownership interest in the Tax Refunds. The Plaintiffs have objected to those claims, asserting

that the Holding Company is the owner of the Tax Refunds.  Determination of the parties'

competing interests in the Tax Refunds is the very essence of the resolution of that claim

objection.  There can be no clearer example of Justice Robert's description of a matter that must

"necessarily be resolved in the claims allowance process."  As I already observed, the fact that

the resolution of this issue centers on non-bankruptcy law is irrelevant, and indeed, the *Stern*

decision presupposed that "the issue necessarily to be resolved" would involve non-bankruptcy

law.[25]

Accordingly, I hold that I have jurisdiction to consider this dispute and I further find that

I have statutory and constitutional authority to enter a final judgment in this adversary

proceeding because the issue of whether the Tax Refunds are property of the estate is an issue

that arises in this bankruptcy case and must be resolved by ruling on the objection to the FDIC-

R's proofs of claim.

## THE TAX REFUNDS ARE PROPERTY OF THE DEBTOR HOLDING COMPANY

This adversary proceeding is about the Tax Refunds.  Are the anticipated Tax Refunds

property of the Holding Company's bankruptcy estate, as argued by the Plaintiffs, or property of

the FDIC-R?  11 U.S.C. §541 describes property of the estate as "all legal or equitable interests

of the debtor in property as of the commencement of the case" and "[a]ny interest in property

that the estate acquires after the commencement of the case." However, the estate's interest in

property does not change the pre-bankruptcy nature of the interest. 11 U.S.C. §541(d).[26]

---

[25] The FDIC-R relied on two cases in its jurisdictional memorandum – *Siegel v. FDIC (In re Indymac Bancorp, Inc.)*, 2011 WL 2883012 (C.D. Cal. 2011) and *Green v. FDIC (In re Tamalpais Bancorp)*, 2011 U.S. Dist. LEXIS 34118 (N.D. Cal. 2011). I agree with the Plaintiffs that *Siegel* was wrongly decided for the reasons set forth in their jurisdictional memo. The FDIC-R acknowledged at the September 13, 2011 hearing that the district court in *Tamalpais* withdrew its July 15, 2011 ruling of no jurisdiction because the court learned, after issuing its opinion, that the FDIC in that case did file a proof of claim.

[26] "Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable

The Holding Company claims the Tax Refunds are property of its bankruptcy estate and that any interest of the Bank in the Tax Refunds is a claim; the FDIC-R argues that any tax refund to be paid to the Holding Company is  paid  to the Holding Company solely as agent or trustee for the Bank and the other members of the BU Consolidated Tax Group with respect to their allocable interests, if any, in the Tax Refunds.

As noted, there exists between the various members of the BU Consolidated Tax Group an Income Tax Allocation Agreement.  That agreement, previously defined as the TAA, addresses the inter-company framework for filing a consolidated tax return for the BU Consolidated Tax Group, an "affiliated group" as such term is defined in Section 1504 of the Internal Revenue Code.[27] The TAA also specifies how taxes will be paid, and how any tax refund to which the BU Consolidated Tax Group may be entitled, once received, will be distributed.

Treasury and IRS Regulations[28] set forth the procedures pursuant to which consolidated returns are to be filed and the manner in which any tax refund will be paid.  Treasury Regulation §1.1502-77(a)(2) specifically provides that "any refund is made directly to and in the name of the common parent." However, neither the applicable Treasury Regulations nor the Internal Revenue Code resolve, or even contemplate, what happens after a tax refund is paid to the parent of a consolidated group.  Neither the Treasury Regulations[29] nor the Internal Revenue Code contain

---

interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. §541(d).

[27] Title 26 of the United States Code.

[28] I.R.C. §1552 (2011), Treas. Reg. §1.1502-75, and Treas. Reg.  §1.1502-77.

[29] The FDIC-R cites to an Intragency Policy Statement of Income Allocation ("Policy Statement") in a Holding Company Structure which Policy Statement, the FDIC-R submits, "codifies" the *Bob Richards* rule.  The FDIC-R provided no support for its suggestion that a policy can codify anything, and so I have not considered this Policy Statement in making my decision.  *Accord Team Financial, Inc. v. FDIC (In re Team Financial, Inc.)*, 2010 WL

any provision regarding what the parent is to do with the tax refund once received.  Indeed, as several courts have noted "the refund is made payable to the parent and the acceptance of the refund by the parent discharges any liability of the government to any subsidiary. But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government." *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262, 265 (9th Cir.), *cert. denied sub nom. Western Dealer Management, Inc. v. England*, 412 U.S. 919 (1973).  *See Capital Bancshares, Inc. v. FDIC,* 957 F.2d 203 (5th Cir. 1992).  *See also Superintendent v. Ochs (In re First Central Financial Corp.)*, 269 B.R. 481, 489 (Bankr.E.D.N.Y. 2001) ("[U]nder applicable I.R.S. regulations, a parent company acts as agent for the consolidated group in filing consolidated tax returns … [b]ut … this agency is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S."). What has created the issue before me is the fact that the TAA does not address what happens to a tax refund after it is paid to the Holding Company by the IRS.

The FDIC-R argues, relying on the *Bob Richards* case, that, in the absence of an express agreement to the contrary, a tax refund belongs to the failed bank, so long as the failed bank is the tax payer that generated all or most of the tax refund.  Moreover, the FDIC-R asserts, the TAA provides any tax refund belongs to the Bank, and therefore the FDIC-R. The Plaintiffs argue that the provisions of the TAA clearly provide that any claim of the Bank to the Tax Refunds is merely a claim, not an ownership right, and, moreover, to the extent *Bob Richards* had any applicability as a rule of federal common law, it has been overruled by *Atherton v. F.D.I.C.*, 519 U.S. 213 (1997).

---

1730681, at *8 (Bankr. D. Kan. 2010) (regarding the FDIC's mention of the Policy Statement in that case the court noted "[n]ot even the FDIC asserts that this policy statement has the force of law").

In *Bob Richards,* the trustee of the Bob Richards Chrysler-Plymouth debtor estate sued its parent entity, Western Dealer Management, Inc. ("WDM"), to turn over a net operating carryback refund.  WDM had filed a consolidated tax return on behalf of itself, Bob Richards Chrysler-Plymouth, and another wholly owned subsidiary.  There was no dispute that the entire tax refund was due to the losses associated with the operations of the debtor; however, pursuant to the applicable IRS regulations, the entire refund was turned over to WDM.  In affirming the district court's reversal of the bankruptcy referee's order denying the trustee's motion, the Ninth Circuit held that WDM received the tax refund solely as an agent for the consolidated group and "[s]ince there is no express or implied agreement that the agent had any right to keep the refund, we agree with the referee[30] and the district court that WDM was acting as a trustee of a specific trust and was under a duty to return the tax refund to the estate of the bankrupt." 473 F.2d at 265. In coming to this conclusion the Ninth Circuit observed that "[n]ormally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability." *Id.* at 264.

Although at no point did the Ninth Circuit explain how an agency turned into a specific trust arrangement, the FDIC-R argues, and certain courts have held, that the *Bob Richards* case created a federal common law rule that the parent of a consolidated group receives a tax refund as trustee of a specific trust in the absence of an implied or express agreement to the contrary.

The *Bob Richards* case has informed the analysis of every case that has addressed the relative rights of members of consolidated tax groups to actual or potential tax refunds, whether or not[31] there has been a written allocation agreement.  In *B & D Bancorp, Inc. v. FDIC,* Dist. Ct.

---

[30] This appears to be a mistake by the Ninth Circuit as the district court reversed the bankruptcy referee's order.
[31] *See, e.g., FDIC v. Brandt* (*In re Florida Park Banks, Inc.*), 110 B.R. 986 (Bankr. M.D. Fl. 1990) (No agreement, so the court allocated the refund in accordance with the individual taxpayer's attributable share.); *Jump v.*

Case No. 94-1341-IEG (S.D. Cal. 1997),[32] the consolidated group did have a tax allocation

agreement. The debtor parent holding company received a tax refund that was undisputedly

attributable to tax activities at the bank level. The bank had also been taken over by the FDIC.

The FDIC filed a contingent claim in the holding company's bankruptcy case and asserted that

the tax refunds were not property of the holding company's bankruptcy estate, but rather, were

held in trust by the holding company for the bank.   The debtor holding company argued that,

pursuant to the language of the tax allocation agreement, the obligations of the holding company

to turn over all or part of the refund to the subsidiary bank amounted to a claim by the bank

against the holding company, and thus no trust arrangement existed. The district court, bound by

the holding in *Bob Richards* held that, because the tax allocation agreement in *Bancorp* not only

required the parent to immediately turn over the tax refund to the bank, but also specifically

addressed a "unique" situation in which the holding company's obligation to pay the tax refund

did create a debtor/creditor relationship,[33] any other circumstance fell within the agency/trust

relationship defined by *Bob Richards* and the tax refund was not property of the bank holding

company's bankruptcy estate. *Accord Capital Banchsares Inc. v. FDIC*, 957 F.2d 203 (5th Cir.

1992) (the court held the bank and its holding company did not have an implied agreement

regarding allocation of tax refunds and therefore tax refunds generated solely by losses incurred

by the bank were property of the bank).

    In *Franklin Savings Corp. v. Franklin Savings Assoc.*, 159 B.R. 9 (Bankr. D. Kan.

1993),[34] the bankruptcy court held that a tax refund paid to the debtor bank holding company

---

*Manchester Life & Casualty Management Corp.*, 438 F. Supp. 185 (E.D. Mo. 1977), *aff'd* 579 F.2d 449 (8th Cir.
1978) (same).
[32] This is an unreported decision and presumably of little, if any, precedential value, but it is nonetheless relied upon
the FDIC-R as illustrative of application of the *Bob Richards* "rule."
[33] Under the tax allocation agreement in *Bancorp*, the holding company could "borrow" the tax refund from the
bank, subject to applicable regulatory requirements governing loans to affiliates.
[34] This case was cited, and distinguished, by the district court in *Bancorp*.

("FSC") was property of the debtor's bankruptcy estate and not of the subsidiary bank ("FSA").

The Resolution Trust Corporation, as receiver for FSA, argued that since FSA was charged with

making all the tax payments on behalf of the consolidated group, under the *Bob Richards*

presumption, FSC acted as trustee for the benefit of FSA when it received tax refunds. The court

rejected the RTC/FSA's argument. In rendering its decision the bankruptcy court looked at the

tax reimbursement agreement between the parties.  While the bankruptcy court recognized, and

in fact partially endorsed, the principals set forth in *Bob Richards*,[35] it held that the tax

reimbursement agreement was controlling. The tax reimbursement agreement used terms such as

"reimburse" and "credits" – the language of claims, not ownership, trust, or agency. The plain

language of the agreement overrode the *Bob Richards* presumption. The court also rejected other

arguments raised by the RTC/FSA relating to the duties of a shareholder to its parent under

Kansas law, recognizing that, under Kansas corporate law, where the parties have an agreement

in writing to allocate tax liabilities and refunds, even if the agreement creates an advantage to

one party over another; "the agreement will control unless it can be shown that the advantaged

member has acted 'unfairly' in the fiduciary relationship," which the court found was not the

case with respect to the FSC/FSA agreements. *Id.* at 30. Finally, the court also refused to

consider the RTC/FSA's argument that the court should impose a constructive trust, noting that

the allocation provisions of the tax reimbursement agreement did not give rise to "fraud or other

unconscionable conduct [that] improperly confers advantage within a fiduciary relationship," a

requirement under Kansas law to impose a constructive trust. *Id.*

---

[35] "When a subsidiary pays the original tax and incurs net operating losses that generate a refund, the subsidiary is entitled to any such tax refund.  The parent is not entitled to keep the refund, or to offset it against amounts due from the subsidiary. The parent simply acts as a trustee or an agent, and it should pay the funds over to the subsidiary." 159 B.R. at 29.

In *Ochs*, 269 B.R. 481, the liquidator of an insurance company sued the chapter 7 trustee of the insurance company's corporate parent seeking a determination that a tax refund held by the chapter 7 trustee was not property of the bankruptcy estate.  In *Ochs* a tax allocation agreement between the insurance company and the debtor/parent provided for the payment of taxes and the allocation of tax refunds among the parties to the allocation agreement. The bankruptcy court held that under the terms of the allocation agreement the insurance company was entitled to a portion of the tax refund.  The issue was the nature of that entitlement – was it a claim against the parent or a right to the funds as the beneficial owner?  Referring to the *Franklin* case for support, the court noted that nothing in the allocation agreement suggested that the tax refund was held in trust by the parent for the insurance company subsidiary.  Nor did the agreement in any way create an agency relationship. *See Team Financial, Inc. v. FDIC (In re Team Financial, Inc.),* 2010 WL 1730681 at *5 (Bankr. D. Kan. 2010) (while parent holding company may have had contractual obligations under a consolidated group tax allocation agreement regarding the "handling or distribution of the tax refund," nothing in the agreement "operates to elevate these duties to the level of an express trust nor designates [the holding company] as trustees or agents of the affiliated entities in the consolidated tax group"). The *Ochs* court also rejected the argument that the funds were subject of a constructive trust, holding that there was no evidence of overreaching or a breach of fiduciary duty by the parent.

In sum, where the members of a consolidated tax group have no express or implied agreement or where the agreement does not fully address the relative rights of the parties, most courts have looked to the *Bob Richards* holding to resolve that a holding company in a consolidated group receives the money as an agent and trustee for the group.  If there is an

agreement, then the court interprets the relative rights of the parties in accordance with the agreement.

In this case the parties agree that the TAA sets out a framework for the allocation of tax liability and tax refunds for any consolidated group returns. The TAA requires that "[e]ach member of the Group shall record an inter-company **income tax receivable** or **payable** with BankUnited in the amount of its current net income tax asset or liability as determined in Section 2. Upon the filing of any consolidated income tax return or amended return, the **inter-company income tax receivables** and **payables** of all members of the Group shall be adjusted to reflect its share of the actual consolidated income tax payable or receivable as determined on a separate-entity basis." (emphasis supplied). The Plaintiffs argue that it is clear that because the responsibilities and obligations of the members of the BU Consolidated Tax Group to each other are expressed in terms of payables and receivables, these inter-company obligations are debts and claims.  Therefore, the failure of any member of the group to pay its fair share of a tax liability is a claim held by the entity that pays the tax, and the failure of any member to pay over to another member its proportionate share of any tax refund is a debt to that member.  The FDIC-R doesn't disagree with the Plaintiffs' interpretation of the TAA, but argues that the provisions of the TAA make clear that the creditor is the Bank, because the TAA provides that the Bank, rather than the Holding Company, shall distribute any tax refund to the various other members of the BU Consolidated Tax Group.[36]

Thus, both parties agree that the TAA governs and that the TAA describes the intercompany obligations as debtor/creditor obligations, but the parties disagree on the nature of

---

[36] Section 4 of the TAA states that "each member of the Group having a net inter-company income tax payable shall pay such amount to BankUnited [the Bank]; and BankUnited shall reimburse any member of the Group for net inter-company income tax receivables. Any income tax refunds received by BankUnited shall be allocated among and paid to the members of the Group in accordance with Sections 2 and 3."

the obligation as between the Holding Company and the Bank. This is because the TAA is silent about what happens between delivery of a tax refund by the IRS to the Holding Company and distribution by the Bank to its affiliates of any allocable portion of a tax refund. As there is no express agreement regarding this particular issue, I must determine whether there is an implied agreement regarding the treatment of the Tax Refunds and if so, what is that implied agreement.

There is no question that the TAA presumes that at some point the Holding Company is going to deliver a tax refund to the Bank; that is implicit in the TAA's provision that the Bank gives out the allocable shares in any refund to the group.[37] But there is also no question that the TAA does not require the Holding Company to deliver those funds to the Bank, nor does anything in the TAA suggest that the Holding Company accepts those funds from the IRS in any kind of trust or agency capacity or holds the funds under any specialized status that would cause those funds to be considered something other than the property of the Holding Company when in its possession. *Cf. Lubin v. FDIC*, 2011 WL 825751 (N.D. Ga. 2011) (the allocation agreement specifically required the holding company to turn over refunds to the bank and other members of the consolidated group and specifically identified the holding company as the agent for the other members).

Moreover, unlike the *Bancorp* case, nothing in the TAA suggests that there are particularized instances when the obligations between the Holding Company and the Bank *would* create a debtor/creditor relationship, such that in all other instances the nature of the obligation is something else. Indeed, as already noted, the entire relationship between the various members of the BU Consolidated Tax Group is described in the TAA only in terms of payables and receivables – inter-company debts and claims. Depending on how the tax balance sheet

---

[37] Neither party in its statement of uncontested facts suggested that the Holding Company routinely turned over the tax refunds to the Bank, but even if the Holding Company did so, that alone does not create an agency or trust relationship. *Accord Ochs*, 269 B.R. at 212-13.

obligations are set up at a particular time, the fact that the Bank, when it holds the funds, stands

as the debtor or creditor, does not change the fact that when the Holding Company holds the

funds it also has the status of the debtor or creditor.

There is nothing under Delaware law,[38] which governs the TAA, that would preclude or

alter this arrangement. Nor has the FDIC-R suggested the TAA violates Delaware corporate law.

Like the Kansas law discussed by the bankruptcy court in *Franklin Savings Corp.*, Delaware's

corporate law allows the members of a consolidated group to allocate amongst themselves their

rights and obligations with respect to tax obligations and refunds, and, in the absence of

inappropriate overreaching, those agreements will be honored.  *See In re Marvel Entertainment*

*Group, Inc*., 273 B.R. 58, 78-9 (D. Del. 2002); *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883,

888 (Del. 1970); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 76 (Del. Ch. 1969); *Meyerson*

*v. El Paso Natural Gas Co.,* 246 A.2d 789, 794 (Del. Ch. 1967). *Accord NetBank*, 2010 WL

7842030, at *7 (Bankr. M.D. Fla. 2010) (applying Georgia law the court wrote "the members of

[a consolidated] group may allocate [tax] rights under an agreement, in which case, the

agreement will control").

Moreover, there is no specific trust[39] or agency[40] relationship created by the TAA, and no

basis has been alleged or shown to find an implied trust. Under Delaware law, like most states, a

constructive trust may only be imposed where there has been fraud or wrongdoing. *See Agilent*

*Techs., Inc. v. Kirkland*, 2010 WL 610725, at *32 (Del. Ch. 2010); *Envo, Inc. v. Walters*, 2009

---

[38] Both parties agree that Delaware law governs the resolution of this dispute.  *Accord Jump v. Manchester Life & Casualty Management Corp.*, 579 F.2d at 452 ("In the absence of controlling federal law, state law governs the rights and responsibilities as between a parent corporation and its subsidiaries.")

[39] Under Delaware law "[t]he elements of an express trust are a competent settlor and trustee, intent, sufficient words to create a trust, an ascertainable trust res, certain and ascertained beneficiaries, a legal purpose, and a legal term." *In re Moran*, 413 B.R. 168, 186 (Bankr. D. Del. 2009).

[40] Under Delaware law "[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Fisher v. Townsends,* 695 A.2d 53, 57-8 (Del. 1997).

WL 5173807, at *6 (Del. Ch. 2009); *McMahon v. New Castle Assocs.*, 532 A.2d 601, 609 (Del. Ch. 1987). *Accord Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.)*, 377 F.3d 209, 216 (2d Cir.2004) (under New York law "a constructive trust is an equitable remedy intended to be "fraud-rectifying" rather than "intent-enforcing"); *City National Bank of Miami v. General Coffee Corporation (In re General Coffee Corporation)*, 828 F.2d 699 (11th Cir. 1987). The uncontested facts make no suggestion that there is any basis upon which I should impose a constructive trust.  Moreover, as noted by the Second Circuit in *Ochs,* while there is a written agreement, it is not appropriate to impose a constructive trust to alter the terms of that agreement in the absence of fraud.  377 F.3d at 213-14.

To the extent that *Bob Richards* creates a federal common law trust doctrine, I note that I am not bound by the *Bob Richards* case; moreover I believe it more likely the Ninth Circuit was not creating a "new law" but rather assumed a knowledge of California law that would have supported such a conclusion. More importantly, because *Bob Richards* recognizes that an express or implied agreement will control the issue of ownership of the Tax Refunds, the "federal common law" is inapplicable, for the reasons I have already stated.[41]

In conclusion, I find I have jurisdiction to enter final judgment in this adversary proceeding, and I hold that the Tax Refunds are property of the Holding Company.

# # #

Copies to:
Mark D. Bloom, Esq.
Andrew B. Kratenstein, Esq.

Attorney Bloom is directed to serve a copy of this Order upon all parties in interest and file a certificate of service with the Clerk of the Court.

---

[41] Based on this ruling I do not need to reach the *Atherton* issue raised by the Plaintiffs in their pleadings.